**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**CHARELESTON DIVISION**

| | |
|---|---|
| DEFENDERS OF WILDLIFE and SOUTH CAROLINA COASTAL CONSERVATION LEAGUE,<br><br>Plaintiffs,<br><br>v.<br><br>ROBERT H. BOYLES, JR., in his official capacity as Director of the South Carolina Department of Natural Resources; BLAIK KEPPLER, in her official capacity as Acting Deputy Director of the Marine Resources Division of the South Carolina Department of Natural Resources; MELVIN BELL, in his official capacity as Director of the Office of Fisheries Management of the South Carolina Department of Natural Resources; and CHARLES RIVER LABORATORIES INTERNATIONAL, INC.,<br><br>Defendants. | Civil Action No. 2:22-cv-00112-RMG<br><br><br>**ORDER AND OPINION** |

This matter comes before the Court on Defendants' motions to dismiss for lack of standing and failure to state a claim pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) (Dkt. Nos. 28, 29). Plaintiffs have filed a response in opposition (Dkt. No. 35), and Defendants have filed a reply (Dkt. No. 36). For the reasons set forth below, the motions to dismiss are denied.

**I.    Background**

Plaintiffs allege Defendants have violated Section 9 of the Endangered Species Act by committing an impermissible "take" of a threatened migratory shorebird, the *rufa* red knot. (Dkt. No. 1, ¶ 1). Plaintiffs do not claim that the Defendants harm the red knots directly, but instead

1

contend that the Defendants deprive the birds of a critical food source, horseshoe crab eggs. (*Id.*, ¶ 12).

Defendant Charles River is a pharmaceutical company that harvests horseshoe crabs to test pharmaceutical products, like vaccines, drugs, and medical devices, for potentially fatal contamination. (Dkt. No. 28-1 at 3). The test employed by Charles River relies on horseshoe-crab blood. (*Id.* at 4). To obtain the blood, Charles River harvests horseshoe crabs by hand as they come ashore on South Carolina beaches. (*Id.* at 5). Charles River then transports the crabs to either a temporary containment pond or a laboratory, where some of the crabs' blood is extracted. (*Id.*) After extraction, the crabs are transported and released back to South Carolina's coastal waters. (*Id.*) Charles River harvests the crabs and maintains the containment ponds pursuant to a South Carolina Department of Natural Resources permit that allows possession of horseshoe crabs for biomedical purposes. (Dkt. No. 1, ¶¶ 6, 8).

Plaintiffs claim that the main food source for red knots on South Carolina beaches are horseshoe crab eggs. (*Id.*, ¶ 59). According to Plaintiffs, horseshoe crab eggs allow red knots to gain the necessary mass to survive their migration more so than other food sources like clams and mussels. (*Id.*) Red knots must purportedly consume several hundred thousand horseshoe crab eggs to fuel the next leg of their journey and reproduce. (*Id.* at ¶ 59).

The population of red knots has declined rapidly in the last 50 years leading to it being listed as a threatened species under the Endangered Species Act. Endangered and Threated Wildlife and Plants; Threatened Species Status for the Rufa Red Knot, 79 Fed. Reg. 73705 (to be codified at 50 C.F.R. pt. 17). Plaintiffs allege a significant factor in this decline has been the harvesting of horseshoe crabs for use in the biomedical industry. (Dkt. No. 1, ¶¶ 81-84).

Plaintiffs Defenders of Wildlife and South Carolina Coastal Conservation League sued, on behalf of themselves and their members, to enjoin the use and authorization of the containment ponds in South Carolina. (*Id.*, ¶ 19-25). Plaintiffs allege the crabs that go to the containment ponds are often held there for weeks or months at a time until capacity in the laboratory opens up. (*Id.*, ¶ 85). Plaintiffs contend that this containment deprives the red knots of a necessary food source and constitutes a "take" under Section 9 of the ESA. (*Id.*, ¶ 1). Defendants now challenge Plaintiffs standing to sue and the sufficiency of their Complaint. (Dkt. Nos. 28, 29).

## II. Legal Standard

### A. 12(b)(1)

Under Rule 12(b)(1), a party may assert that a court lacks subject matter jurisdiction over a plaintiff's complaint by challenging the plaintiff's standing. *See, e.g.*, *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 459 (4th Cir. 2005). This challenge under Rule 12(b)(1) may proceed either as a facial challenge, asserting that the allegations in the complaint are insufficient to establish subject matter jurisdiction, or a factual challenge, asserting "that the jurisdictional allegations of the complaint are not true." *Kerns v. U.S.*, 585 F.3d 187, 192 (4th Cir. 2009) (citing *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)). When a defendant facially challenges the complaint, "the plaintiff . . . is afforded the same procedural protection as he would receive under a Rule 12(b)(6) consideration," meaning a court must accept all factual allegations in the complaint as true. *Kerns*, 585 F.3d at 192; *accord South Carolina State Conference of NAACP v. Alexander*, No. 3:21-cv-03302, 2022 WL 453533, at *1 (D. S.C. Feb. 14, 2022) ("The same standard generally applies to both a motion to dismiss for failure to state a claim under Rule 12(b)(6) and a motion to dismiss for lack of standing under Rule 12(b)(1)."). For a factual challenge, on the other hand, the court

3

may go beyond the complaint to resolve the disputed jurisdictional facts. *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017).

### B. 12(b)(6)

A Rule 12(b)(6) motion tests the sufficiency of the complaint. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The "court must accept as true all of the allegations contained in a complaint," but cannot accept mere "[t]hreadbare recitals of the elements of a cause of action." *Iqbal*, 556 U.S. at 678. Rather, a plaintiff must allege facts "sufficient to state all the elements of her claim," *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003), and sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. In other words, the well-pleaded facts must allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## III. Discussion

### A. Standing

Standing is an essential component to a justiciable "case" under Article III. *Steel Co. v. Citizens for a Better Env't*, 523 U.S 83, 102 (1998). In order to establish standing, the plaintiff must show three basic elements: (1) the plaintiff must have suffered an "injury in fact," (2) the injury must be "fairly traceable" to the defendant's challenged conduct, and (3) it must be likely that the plaintiff's injury would be redressed by the requested relief. *Lujan v Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). When assessing standing before a federal court, "[t]he party invoking federal jurisdiction bears the burden of establishing these elements." *Id.* at 561.

Organizations, like Plaintiffs, can assert standing in two different ways. An organization can assert standing in its own right based on an injury to the organization, or it can assert standing as the representative of its members who have been harmed. *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 155 (4th Cir. 2000). Plaintiffs assert that they have standing to sue under both theories; Defendants assert that Plaintiffs did not have standing to sue under either theory. As shown below, Plaintiffs have sufficiently established direct organizational standing, and therefore the Court need not address whether they have sufficiently established representational standing. *E.g.*, *Harrison v. Spencer*, 499 F.Supp.3d 594, 601 (E.D. Va. 2020).

In determining whether organizational standing exists, "a court conducts the same inquiry as in the case of an individual." *Md. Highways Contractors Ass'n, Inc. v. Maryland*, 933 F.2d 1246, 1250 (4th Cir. 1991). That means courts evaluate whether the organization meets the three elements mentioned above—injury in fact, causation, and redressability. *Southern Walk at Broadlands Homeowner's Ass'n, Inc. v. Open Band and Broadlands, LLC*, 713 F.3d 175, 182 (4th Cir. 2013).

**1. Injury in Fact**

"An organization may suffer an injury in fact when a defendant's actions impede its efforts to carry out its mission." *Lane v. Holder*, 703 F.3d 668, 674 (4th Cir. 2012). One impediment that the Supreme Court and Fourth Circuit have recognized as an injury is a "drain on the organization's resources" that frustrates the organization's purpose. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *PETA v. Tri-State Zoological Park of W. Md., Inc.*, 843 Fed. Appx. 493, 496 (4th Cir. 2021). Certain expenditures, however, cannot confer organizational standing. *Equal Rights Ctr v. Post Prop., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011). For example, an

5

organization's expenditure on a lawsuit cannot constitute an injury in fact sufficient to establish standing. *Id.* Otherwise, the very act of filing suit would confer standing. *Id.*

Plaintiffs argue that they have direct standing because Defendants use and authorization of horseshoe crab containment ponds frustrate Plaintiffs' missions and their members' interest. (Dkt. No. 35 at 18). According to Plaintiffs, Defendants' actions have forced Plaintiffs to divert resources away from other mission-based projects. (*Id.*) For example, Plaintiff Defenders of Wildlife, a conservation group dedicated to protecting wildlife and their habitat, have been forced to divert resources away from advocating to protect an endangered species of mussel from sand mining along Tennessee's Duck River in order to investigate, research, educate the public about, and advocate for regulation of horseshoe crab containment ponds. (*Id.*) To support this argument, Plaintiffs rely on the Supreme Court's decision in *Havens Realty* and the Fourth Circuit's decision in *PETA*.

Defendants argue that Plaintiffs alleged harms are merely self-inflicted budgetary choices and not a cognizable legal injury. (Dkt. No. 28-1 at 14). According to Defendants, Plaintiffs have prioritized certain initiatives over others by allocating resources to investigate, research, educate the public about, and advocate for regulation of horseshoe containment ponds. (*Id.*) Defendants argue that Plaintiffs purpose is not frustrated because this reallocation of resources falls squarely within Plaintiffs' missions. (*Id.* at 16). To support this argument, Defendants rely on the Fourth Circuit's decision in *Lane*.

In *Havens Realty*, the Supreme Court held that an organization dedicated to achieving equal opportunity in housing had sufficiently alleged organizational standing to sue an apartment complex owner for allegedly unlawful racial steering practices. 455 U.S. at 379. The organization alleged that it "ha[d] been frustrated by [the] racial steering practices in its efforts to assist equal

6

access to housing through counseling and other referral services," and that it had "devoted significant resources to identify and counteract the . . . racially discriminatory steering practices." *Id.* The Supreme Court reasoned that "[i]f [the] steering practices ha[d] perceptibly impaired [the organization's] ability to provide counseling and referral services for low- and moderate- income home-seekers, there [could] be no question that [it] had suffered an injury in fact" because [s]uch concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitute[d] far more than simply a setback to the organization's abstract social interest." *Id.*

In *PETA*, the Fourth Circuit held that PETA, whose mission is to protect animals from abuse, neglect, and cruelty, had organizational standing to challenge a zoo's inhumane treatment of animals in captivity. 843 F. App'x at 495. PETA alleged that, as a result of the defendants' conduct and in accordance with its mission, it "devoted its resources to submit complaints about defendants to government agencies, compile and publish information about [defendants'] treatment of animals, and to investigate and monitor" the defendants which in turn "reduc[ed] its ability to engage in mission related campaigns against other zoos." *Id.* at 496. The Fourth Circuit reasoned that PETA had been injured because defendants conduct "'perceptibly impaired'" PETA's ability to carry out its mission through frustration of that mission and a consequent drain on its resources." *Id.* (quoting *Havens Realty*, 455 U.S. at 379).

In *Lane*, the Fourth Circuit held that an organization dedicated to promoting the exercise of the right to keep and bear arms did not sufficiently allege standing to sue the Attorney General of the United States on the basis of an allegedly unconstitutional statute restricting interstate transfers of handguns. 703 F.3d at 675. The organization had alleged that "[its] resources [were] taxed by inquiries into the operation and consequences of interstate handgun transfer provisions."

7

*Id.* The court reasoned that this expense to the organization did not constitute an injury because "[a]lthough a diversion of resources might harm the organization by reducing the funds available for other purposes, it results not from any actions taken by the defendant, but rather from the organization's own budgetary choices." *Id.* (cleaned up).

Plaintiffs organizational standing allegations are sufficient to establish a theory of organizational injury. Like PETA, Plaintiffs have alleged a diversion of resources for investigation, research, education, and public advocacy to address the challenged horseshoe crab containment practices. (Dkt. No. 1 at ¶ 22-23). Plaintiffs also specifically alleged in the Complaint a mission-based project that has suffered, the Tennessee Duck River endangered mussel project. (Dkt. No. 1 at ¶ 22-23). This diversion of funds to counteract the alleged harm to threatened red knots is not voluntary because it is Plaintiffs' mission to protect threatened wildlife. Because Defendants alleged conduct has "perceptibly impaired" Plaintiffs' ability to carry out their missions and because Plaintiffs used resources to counteract that impairment, Plaintiffs have met the injury standard set out in *Havens Realty*.

**2. Causation and Redressability**

Defendants' causation and redressability arguments mirror their injury argument. Defendants argue that causation is not met because the alleged injury is voluntary and self-inflicted. (Dkt. No. 28-1 at 16). Defendants similarly argue that redressability is not met because a halt in Plaintiffs diversion of resources would be dictated by Plaintiffs themselves, not by enjoining the use of containment ponds. (Dkt. No. 36 at 6). Plaintiffs argue that enjoining the use of containment ponds would cure the harm to Plaintiffs' missions and eliminate the need to divert resources from other projects. (Dkt. No. 35 at 22).

Because the Court finds that the alleged injury is not voluntary or self-inflicted, *supra* II.A.2.a.i, Defendants' causation and redressability arguments fail. Accordingly, Plaintiffs have alleged organizational standing to sue.

### B. Motion to Dismiss

#### 1. Documents Considered

Before turning to the parties' arguments, the Court must determine what documents may be considered in its Rule 12(b)(6) analysis. For their Rule 12(b)(6) argument, Defendants rely on Atlantic States Marine Fisheries Commission (ASMFC) reports to assert that the South Carolina horseshoe crab population is in good condition, and thus, that no take of red knots is plausible. (Dkt. No. 28-1 at 28-30). Even though the report is not cited in the Complaint, Defendants contend that the Complaint relies on the ASMFC reports findings and that the Court should consider the documents at pleading stage. (*Id.* At 27).

A court's evaluation of a motion to dismiss is generally limited to a review of the allegations of the complaint itself and any documents attached or incorporated into the complaint. *Goines v. Valley Community Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016). *Id.* Considering extrinsic documents during the pleading stage improperly converts a motion to dismiss into a motion for summary judgment. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011). "This conversion is not appropriate when the parties have not had an opportunity to conduct reasonable discovery." *Zak v. Chelsea Therapeutics Intern., Ltd.*, 780 F.3d 597, 606-07 (4th Cir. 2015) (citing *E.I. du Pont de Nemours*, 637 F.3d at 448; Fed. R. Civ. P. 12(b), 12(d), and 56).

The Fourth Circuit has recognized an exception to this extrinsic document rule: Courts "may consider a document submitted by the movant that was not attached to or expressly

9

incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Goines*, 822 F.3d at 166.

A document is integral to a complaint if the claims turn on or are otherwise based on statements contained in the document. *See Id.*. "Limited quotation from or reference to documents that may constitute relevant evidence in a case is not enough to incorporate those documents, wholesale, into the complaint." *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004). The court also considers whether the plaintiff disputes that the document proffered by the moving defendant is integral to the complaint. *See Goines*, 822 F.3d 159 at 166 ("[B]ecause [plaintiff] does not argue otherwise, we will assume without deciding that the [extrinsic document] was integral to the complaint.").

Examples of extrinsic documents found integral to the complaint by courts in this district include a contract that gave rise to a breach of contract claim, *U.S. v. Savannah River Nuclear Solutions, LLC*, No. 1:16-cv-00825, 2016 WL 7104823, at *7 (D. S.C. December 6, 2016), an internal audit report whose nondisclosure was a basis for a False Claims Act claim, *Id.*, and an agreement letter that was the basis for alleging a defendant was a party in interest in an ERISA prohibited transaction claim, *Williams v Centerra Group, LLC*, No. 1:20-cv-04220, 2021 WL 4227384, at *3 (D. S.C. September 16, 2021). These examples suggest that for an extrinsic document to be integral to a complaint the document must either give rise to a claim or be the basis of an element of a claim.

Here, the ASMCF reports do not give rise to Plaintiffs' ESA claim, nor do they serve as a basis for any element of the claim. Defendants argue that the Complaint relies on the reports without citing to them. (Dkt. No. 36 at 9). Defendants point to two examples where the Complaint directly relies on the ASMCF reports and notes a cited newspaper article that in turn relies on

ASMCF data. (*Id.* at 9-10). Plaintiffs' claims, however, do not "turn on" the facts that Defendants identify. Those facts discuss the increase in biomedical harvest of horseshoe crabs in South Carolina. (*Id.*; Dkt. No. 1, ¶¶ 75-76). Without those facts, Plaintiff could still plausibly allege that Defendants "take" red knots by depriving the birds of a critical food source. In fact, Plaintiffs pled that Defendants containment of tens of thousands of crabs in artificial ponds during the red knots stopover season causes a take of red knots by depriving them of a critical food source. (Dkt. No. 1 at ¶ 6-7, 64, 93, 98, 104, 106). That argument by Plaintiffs is irrespective of the status of horseshoe crab population that the ASMCF data provides. Additionally, Plaintiffs dispute that the ASMCF reports are integral to the Complaint. (Dkt. No. 35 at 8, 27). The Court therefore declines to consider the ASMCF reports for its Rule 12(b)(6) analysis.

### 2. Sufficiency of Plaintiffs' Endangered Species Act Allegations

Section 9 of the ESA makes it unlawful to "take" an endangered species. 16 U.S.C. § 1538(a)(1)(B). This prohibition has been extended by regulation to include threatened species. 50 C.F.R. § 17.31(a). To "'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct." 16 U.S.C. § 1532(19). Harass in the definition of take means an "act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, . . . feeding . . . ." 50 C.F.R. 17.3; *accord Greenpeace v. Nat'l Marine Fisheries Serv.*, 106 F. Supp. 2d 1066, 1070 (W.D. Wash. 2000) (finding that Alaskan fisheries' operations may constitute taking of Steller sea lion where fisheries are catching fish normally eaten by the sea lion).

Accordingly, the facts alleged in the complaint, taken as true and construed in favor of the Plaintiffs, must show that Defendants have plausibly committed an impermissible take of the red

knots as outlined above. Defendants argue that Plaintiffs have failed to allege take and proximate cause.

### a. Take

Plaintiffs have alleged the following facts: (1) the decline in red knots is due to a lack of horseshoe crabs spawning on South Carolina beaches (*see* Dkt. No. 1, ¶ 68); (2) Defendants harvest thousands of horseshoe crabs from South Carolina beaches and keep some of the harvested crabs in containment ponds for weeks or months at a time (*Id.*, ¶ 6); (3) the horseshoe crabs are harvested at times and in areas where red knots are foraging for horseshoe crab eggs (*Id.*, ¶ 3-5, 7); and (4) horseshoe crab eggs are a critical food source for red knots' survival and reproduction (*Id.*, ¶ 5).

These facts allow the Court to draw the reasonable inference that Defendants' use and authorization of containment ponds significantly disrupt the normal feeding patterns of red knots.

### b. Proximate Cause

Defendants specifically argue that Plaintiffs failed to allege facts that give rise to a reasonable inference that Defendants' conduct proximately caused a take of any red knots. (Dkt. No. 28-1 at 23). Indeed, proximate causation and foreseeability are required elements of ESA Section 9 claims, *see Babbitt*, 515 U.S. at 700 n.13, and should be sufficiently alleged.

Defendants argue that the causal relationship between the containment ponds and a take is too attenuated because of the sheer number of complex, entirely unrelated stressors to the red knots. (Dkt. No. 28-1 at 24). To support its argument, Defendants cite a Fish and Wildlife Service document, which the Complaint cited, that lists numerous threats to the species that are unrelated to horseshoe crabs. (*Id.*) In response, Plaintiffs maintain that the Defendants use and authorization

of horseshoe crab containment ponds are at least partly responsible for the decline in red knots. (Dkt. No. 35 at 26).

The ESA does not require the defendant to be the sole threat to the species. *See, e.g.*, *Marbled Murrelet v. Babbit*, 83 F.3d 1060, 1062 (9th Cir. 1996) (noting factors other than defendants' destruction of old-growth forests pose a threat to the survival of the marbled murrelet). The independent threats here, however, seem more extensive than those at issue in other ESA cases. *Cf. Marbled Murrelet*, 83 F.3d at 1062 (explaining that the "most significant factor" in the rapid decline of the marbled murrelet was the defendants' conduct).

Construing the facts in favor of the Plaintiffs, the Court finds that the Complaint contains sufficient allegations for proximate cause. For example, Plaintiffs allege that Defendants harvest spawning horseshoe crabs at the exact time red knots need to feed on the eggs, preventing the red knots from gaining the proper nutrition needed to sustain their migration. (Dkt. No. 1, ¶¶ 7, 110). As such, the Court rejects Defendants proximate cause arguments at this stage.

## IV.     Conclusion

For the reasons mentioned above, the Court **DENIES** Defendants' Motions to Dismiss (Dkt. No. 28).

       s/Richard Gergel
Richard Mark Gergel
United States District Judge

June 17, 2022
Charleston, South Carolina