**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| DEFENDERS OF WILDLIFE and SOUTH CAROLINA COASTAL CONSERVATION LEAGUE,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>ROBERT H. BOYLES, JR., in his official capacity as Director of the South Carolina Department of Natural Resources, and CHARLES RIVER LABORATORIES, INTERNATIONAL, INC.,<br>　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civ. No. 2:22-CV-112-RMG |

## PLAINTIFFS' COMBINED MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT

Plaintiffs Defenders of Wildlife ("Defenders") and South Carolina Coastal Conservation League (the "League") respectfully move the Court for a preliminary injunction against Defendant South Carolina Department of Natural Resources' ("SCDNR") authorization of horseshoe crab containment ponds and Defendant Charles River Laboratories International, Inc.'s ("Charles River") use of horseshoe crab containment ponds. For the reasons set forth herein, and based on the evidence and affidavits filed in support of this motion, Plaintiffs have made a clear showing on each of the four elements warranting preliminary injunctive relief.[1]

---

[1] Pursuant to Local Civil Rule 7.02, prior to filing this motion, Plaintiffs' counsel conferred with counsel for both Defendants regarding this motion. The parties were unable to reach an agreement. SCDNR takes no position on this motion and Charles River opposes it.

　　Regarding the confidential documents discussed herein, Plaintiffs have redacted all information designated as "Confidential" by SCDNR or Charles River in this brief and in all exhibits. Plaintiffs are providing an unredacted brief with exhibits to the Court for *in camera* review. As Plaintiffs explained to opposing counsel, however, courts routinely hold that the First Amendment applies to preliminary injunction motions and supporting materials and requires a

## **INTRODUCTION**

As the Court is well aware, this is a case about a migratory shorebird called the *rufa* red knot—a species in rapid decline and listed as "threatened" under the Endangered Species Act ("ESA"). Each spring, the robin-sized birds traverse the globe to reach their Arctic breeding grounds. Red knots stop on South Carolina beaches during this migration for a critical reason— because our State's beaches are the site of large aggregations of spawning horseshoe crabs each April through June. A super-abundance of horseshoe crab eggs on these beaches is critical to migrating red knots' survival and reproduction, as each red knot must consume roughly <u>several hundred thousand</u> of the tiny eggs during its South Carolina stopover to survive its journey to, and breed in, the Arctic.

In South Carolina, there is only one business responsible for horseshoe crab harvesting, which is poised to begin in the next month—Defendant Charles River. At the critical time when horseshoe crabs emerge from the sea to spawn and red knots arrive to feast on their eggs, Charles River takes roughly ███████ spawning crabs from South Carolina beaches annually. The company, acting under permits issued by SCDNR, stores between ███████ ███████

---

higher burden to keep preliminary injunction proceedings redacted or sealed (versus the discovery motions that Plaintiffs have filed in this manner prior to now). *See, e.g., Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1096–1103 (9th Cir. 2016) (applying the "compelling reasons" test to sealing preliminary injunction proceeding, and rejecting "less exacting 'good cause' standard" applicable to sealing discovery motions); *Publicker Indus. Inc. v. Cohen*, 733 F.2d 1059 (3rd Cir. 1984) (finding a First Amendment public right of access to preliminary injunction proceedings); *Bayer Cropscience Inc. v. Syngenta Crop Prot., LLC*, 979 F. Supp. 2d 653, 656 (M.D.N.C. 2013) ("The Court concludes that the briefing and exhibits filed in connection with motions seeking injunctive relief are subject to the public's First Amendment right of access."); *RLI Ins. Co. v. Nexus Servs., Inc.*, No. 5:18-CV-00066, 2018 WL 10602398, at *1 (W.D. Va. Oct. 30, 2018) (holding that "more stringent First Amendment right of public access applies" to sealing a motion for preliminary injunction and supporting evidence). The Court, if it so chooses, would thus be justified in requiring SCDNR and Charles River to meet the more stringent standard discussed in these cases for keeping this motion and supporting evidence from public view.

██████—about ████ crabs in recent years—in artificial containment ponds located away from the State's beaches during the spawning season.[2]

For its convenience, Charles River ████████████████████████████████████████ ██████████████████████, where it drains up to half of the crabs' blood for pharmaceutical use. Horseshoe crabs are harmed in the harvesting process, by transport to and from containment ponds, storage in the ponds, and release from the ponds, causing significant harms above and beyond those inherent in the bleeding process itself. Documents obtained in discovery demonstrate widespread non-compliance with South Carolina law requiring that crabs be "handled so as to *minimize injury*" and "*returned unharmed* to state waters of comparable salinity and water quality . . . ." S.C. Code § 50-5-1330(C) (emphasis added). In 2022, Charles River also ████████████████ a new permit term requiring that ████████████████ ██████████████████. *See* IC Ex. A at 2, 4 (2022 bleeding permit terms); *see also id.* at 6, 8, 10, 12 (2022 pond permit terms).[3] All of these harms flowing from the containment pond process harm individual horseshoe crabs and the population as a whole, thus decreasing their ability to spawn the super-abundance of eggs that threatened red knots rely on.

In addition, harvested horseshoe crabs are not spawning on South Carolina beaches but in artificial containment ponds, depriving red knots of their critical food source at stopover sites during migration and unlawfully "taking" these birds by causing death and impaired breeding, in violation of the ESA. As the United States Fish and Wildlife Service ("Service") commented just this week, Charles River's harvest from a South Carolina wildlife refuge "would lead to a

---

[2] Notably, this is around ████ the annual pond totals alleged in the Complaint, ECF No. 1 ¶ 95.

[3] As with prior filings, Plaintiffs use the prefix "IC" to denote exhibits submitted *in camera* as a result of a Defendant's confidentiality designations.

dramatic reduction in horseshoe crab eggs laid and therefore reduce the availability of this preferred food source for red knots," which "would significantly impact the migratory shorebirds" and "could negatively affect [breeding] success and long-term population viability." U.S. Fish & Wildlife Serv., *Draft Compatibility Determination for the Harvest of Horseshoe Crabs, Cape Romain National Wildlife Refuge*, at 14 (Mar. 14, 2023) (hereinafter "Draft CD for Cape Romain").[4] The same is true of the company's harvest-for-ponds across South Carolina.

For its part, Defendant SCDNR has, for years, been beholden to Charles River and has allowed the company to run roughshod over state regulations.[5] SCDNR has consistently failed to ensure that crabs are handled and stored so as to minimize harm, as the law requires; last year, the agency turned a blind eye when ████████████████████████████████████ ████████████████████████████████. Charles River's influence over the state agency has apparently been without limit. When faced with public scrutiny of its practices, a

---

[4] *Available at* https://www.fws.gov/DraftCD-CapeRomainNWR, https://perma.cc/XBE5-U6GP (permanent link).

[5] In 2022, for example, the Post and Courier published an article on this topic as part of its "Uncovered" series. *See* Tony Bartelme & Shamira McCray, *A South Carolina Agency is Hooked on ... MONKEYS AND BLOOD—SC agency rakes in millions from pharma company it regulates*, The Post & Courier (March 4, 2022), *available at* https://www.postandcourier.com/uncovered/sc-agency-rakes-in-millions-from-pharma-company-it-regulates/article_60a80662-82e1-11ec-94d8-2791d3f53dcd.html, https://perma.cc/A3XZ-LUJE (permanent link). Numerous other media stories and editorials have noted this questionable relationship between SCDNR and Charles River. *See* The Post and Courier Editorial Board, *Editorial: Time to untangle an unintended conflict along SC's shore* (Mar. 12, 2022), *available at* https://www.postandcourier.com/opinion/editorials/editorial-time-to-untangle-an-unintended-conflict-along-scs-shore/article_c3058d62-9f28-11ec-9e27-dbedb95087bd.html, https://perma.cc/6JEM-VCVU (permanent link); Chiara Eisner, *Of McMaster and marshes:  Inside the 500K Proposal to Bleed Protected South Carolina Horseshoe Crabs*, The State (May 5, 2022), *available at* https://www.thestate.com/news/state/south-carolina/article257214377.html.

high-ranking Charles River official remarked that ███████████████████████████
██████████████████████████" IC Ex. B.

Plaintiffs' motion is timely. Over the last several months, Plaintiffs have engaged in discussions with SCDNR to attempt to resolve this matter prior to this year's horseshoe crab spawning season without the need for injunctive relief. But after weeks of negotiations, Charles River's apparent influence over the agency proved to be so great that settlement discussions finally fell apart on Friday, March 3, 2023, necessitating the prompt filing of this motion. *See Solar Eclipse Inv. Fund XXXV, LLC v. $5,000,000*, No. 9:19-1176-RMG, 2019 WL 1930752, at *2 n.2 (D.S.C. Apr. 30, 2019) (Gergel, J.) (granting temporary restraining order and holding that four-month delay did not defeat finding of irreparable harm where plaintiff had used the time to try to resolve the matter, with the last settlement outreach occurring within a month); *see also Kan. Health Care Ass'n, Inc. v. Kan. Dep't of Soc. & Rehab. Servs*., 31 F.3d 1536, 1543–44 (10th Cir. 1994) (holding that a preliminary injunction was timely because the plaintiff had tried to reach a settlement with the defendant and acted within three months of failing to reach such a settlement).

SCDNR's authorization—and Charles River's use—of horseshoe crab containment ponds in South Carolina is causing an unlawful "take" of red knots under the ESA. Plaintiffs will suffer irreparable harm if Charles River is authorized to proceed with harvesting crabs for storage in containment ponds during this spring's spawning season, while any harm to Charles River is speculative and, at most, purely monetary. The public interest favors the protection of a threatened species over Charles River's profits. Plaintiffs' motion should be granted.

## FACTUAL BACKGROUND

**I.    Red Knot Migrations and the Critical Role of Super-Abundant Horseshoe Crab Eggs.**

Each spring, red knots embark on "one of the longest distance migrations known in the animal kingdom," from wintering grounds on the southern tip of South America to breeding grounds in the Canadian Arctic. Endangered and Threatened Wildlife and Plants; Proposed Threatened Status for the Rufa Red Knot (Calidris canutus rufa), 78 Fed. Reg. 60,024, 60,027 (Sept. 30, 2013). Many red knots rely on only one or two "stopovers" along a nearly transpolar flight. Declaration of Dr. Lawrence Niles ("Niles Decl.") ¶ 14.[6]

For many of the red knots that remain, a short stop on the beaches of South Carolina is a "critical" stop along the way. *Id.* ¶¶ 20–22. The Service has proposed a rule designating stopover beaches across South Carolina as red knot critical habitat. Proposed Rule, Endangered and Threatened Wildlife and Plants; Designation of Critical Habitat for Rufa Red Knot (Calidris canutus rufa), 86 Fed. Reg. 37,410, 37,425–27 (July 15, 2021). According to SCDNR, up to two-thirds of visiting red knots fly directly to the Arctic after stopping on our State's beaches. Niles Decl. ¶ 21 (citation omitted).

Red knots have evolved to time their stopover to coincide with horseshoe crab spawning season. *Id.* ¶ 26. Each spring, just as red knots arrive, the crabs emerge from the sea to lay their tiny eggs in beach sands. *Id.* ¶ 25; Declaration of Dr. H. Jane Brockmann ("Brockmann Decl.") ¶ 12.[7]

---

[6] Redacted declaration attached as Ex. A; unredacted version submitted as IC Ex. N.

[7] Redacted declaration attached as Ex. B; unredacted version submitted as IC Ex. O.

The timing is no coincidence. According to the testimony of Dr. Lawrence Niles, one of the world's leading experts on red knots, each bird must consume <u>several hundred thousand</u> horseshoe crab eggs during its South Carolina stopover to survive its arduous migration and breed in the Arctic. Niles Decl. ¶ 29; *see also id.* ¶¶ 26–39. Red knots unable to consume their share of crab eggs are significantly less likely to survive their migration and reproduce. *Id.* ¶¶ 29, 37–39.

Horseshoe crab eggs are fatty, nutrient-rich, and easily digestible. *Id.* ¶ 28; Brockmann Decl. ¶ 12. They are the only source of food available to red knots on South Carolina beaches that allows the birds to reliably build up the fat and protein reserves needed to fly to the Arctic, mate, and reproduce. Niles Decl. ¶¶ 26–30. As SCDNR researchers confirm, "[h]ighly nutritious horseshoe crab eggs and embryos . . . provide a *critical* food resource to the federally threatened *rufa* red knot . . . as it stops to feed in areas, such as . . . South Carolina during its annual migration from southern South America to the Arctic." *See* Michael R. Kendrick et al., *Assessing the Viability of American Horseshoe Crab (*Limulus polyphemus*) Embryos in Salt Marsh and Sandy Beach Habitats*, 240 Biol. Bull. 145, 146 (2021) (emphasis added, citations omitted) (attached as Ex. C, at 2).

SCDNR is correct that the crab's eggs are a "critical" food source for red knots in South Carolina. Niles Decl. ¶¶ 26–39. After flying thousands of miles, the birds are often emaciated by the time they reach South Carolina. *Id.* ¶ 14. To refuel, power a flight to the Arctic, and build up energy to breed in frigid habitat, red knots <u>must increase their body weight by roughly 50%</u> during a stopover. *Id.* ¶¶ 15–17. The birds must gain weight quickly to reach the Arctic before cold weather makes the region inhospitable. *Id.* ¶¶ 18, 30. Red knots "require[] stopovers rich in easily digested food to achieve adequate weight gain that fuels the next migratory flight and,

upon arrival in the Arctic, fuels a body transformation to breeding condition." 78 Fed. Reg. at 60,027 (citations omitted).

Female horseshoe crabs deposit their eggs 10–20 centimeters below the beach surface, Brockmann Decl. ¶ 13, where red knots cannot reach them due to the birds' size and small beak length. Niles Decl. ¶ 36. But when large congregations of crabs spawn on beaches, successive spawning events over several days deposit thousands of eggs in the same spot. Brockmann Decl. ¶¶ 13–14. This displaces earlier-laid eggs, causing them to rise to the beach surface, *id.*, where they become accessible to red knots. Niles Decl. ¶ 36. Thus, red knots require an "accessible egg super-abundance" created by "repeated . . . spawning events." Niles Decl. ¶ 36. It is no surprise, then, that the bird's numbers have dwindled as commercial crab harvesting has exploded on the Atlantic Coast. *See id.* ¶ 10; *see also* Kristin L. Hamilton et al., *Physiological impacts of time in holding ponds, biomedical bleeding, and recovery on the Atlantic horseshoe crab*, Limulus polyphemus, Part A, 239 Comparative Biochem & Physiology 1 (2020) (attached as Ex. D, at 1).

## II.     The Biomedical Harvest and Horseshoe Crab Containment Ponds.

In South Carolina, Charles River is the only entity engaged in horseshoe crab harvesting. Despite the red knot's federally-protected status, SCDNR permits Charles River to harvest large numbers of spawning horseshoe crabs and store them in artificial holding ponds during their spawning exactly when desperately hungry red knots are searching South Carolina beaches for horseshoe crab eggs.

Each spring, as the birds arrive and crabs come ashore to spawn, agents of Charles River, with permits from SCDNR, remove around ███████ crabs from the State's beaches and store

about ████ of them in containment ponds during the spawning season. *See* IC Ex. C at 3[8].

Instead of spawning on beaches, crabs spawn in ponds en masse. Brockmann Decl. ¶¶ 41–44.



***Figure 1, above***. Agents of Charles River remove crabs from Turtle Island, a red knot stopover beach proposed as critical habitat by the Service, in 2019. ECF No. 67 at 13. Large numbers of crabs are also harvested for ponds from red knot beaches across South Carolina. *See* IC Ex. D; Niles Decl. ¶¶ 48–55.

***Figure 2, right.***





---

[8] Plaintiffs earlier submitted *in camera* Exhibit C, SCDNR's First Supplemental Answers to Plaintiffs' First Set of Interrogatories, as *in camera* Exhibit H in support of Plaintiffs' motion to compel, ECF No. 67, and have re-submitted the exhibit *in camera* here, in case the Court no longer has hard copies of that exhibit. References to ECF No. 67—IC Ex. H in Plaintiffs' expert declarations are to IC Ex. C.

Although biomedical horseshoe crab harvesting occurs in several states, South Carolina is the only state that allows crabs to be stored in ponds before bleeding. Crabs are only held in ponds here for Charles River's convenience because ███████████████████████ ████████████████████████████████████████████████ ████████████████████.[9] Thus, crabs are stored in ponds during spawning season ████████████████████████.

Charles River's bleeding operation is ████████████████████ ████████████████████████.[10] The company drains up to half[11] of each crab's blood to extract a substance, called Limulus Amebocyte Lysate ("LAL"), which it sells on the global market as a test for endotoxins in medical equipment and injectable drugs. There is a synthetic alternative to horseshoe crab blood-derived LAL, called recombinant Factor C ("rFC"), shown to be "'equivalent or even superior to LAL.'" ECF No. 1 at 19–20 & nn. 8–10 (collecting and quoting studies). The U.S. Food and Drug Administration approves the use of

---

[9] *See* IC Ex. E (SCDNR analysis, ██████████████████████████████ █████████████████████████████ .

[10] *See* Ex. E (SCDNR's admission that biomedical bleeding "is the only non-research purpose for which crabs may lawfully be taken, transported, or held in ponds in South Carolina," and that "only one entity or person [is] permitted to biomedically bleed or process horseshoe crabs in South Carolina"); IC Ex. A at 1–4 (████████████ 2022 bleeding permits); IC Ex. F (annual letters from ████████ to ████████████, noting that ████████████████ ).

[11] Kristin Linesch Hamilton et al., Ex. D at 5 ("Our results indicate that as much as half of an individual [crab's] total hemolymph volume might be extracted during a standardized eight-minute biomedical bleeding, a substantial loss of hemolymph during an already stressful process.").

rFC if each tested drug or device meets purity standards.[12] Some of Charles River's competitors, such as Eli Lilly, have switched over to the synthetic, with Lilly conducting an estimated 90% of its endotoxin testing using rFC.[13] Charles River continues to fight the use of the synthetic in the United States, most recently petitioning the FDA to limit the use of this alternative.[14]

Rather than switching to the synthetic, Charles River has ▓▓▓▓▓ horseshoe crab harvesting in South Carolina. From 2015 to 2018, Charles River harvested roughly ▓▓▓▓ crabs per year in South Carolina. IC Ex. C at 3. During these years, Charles River stored roughly ▓% of its harvest—around ▓▓▓▓ crabs—in ponds each year before bleeding. *Id.* ▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓. *See* IC Ex. G; *see also* IC Ex. A at 3 (▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓). ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓,

▓▓▓▓▓▓▓▓▓▓▓▓▓▓. *See* IC Ex. C at 3. From 2019 to 2022,

---

[12] *See* US Dep't of Health and Human Services, Food & Drug Admin., *Guidance for Industry – Pyrogen and Endotoxins Testing: Questions and Answers*, at 5 (2012), https://www.fda.gov/files/drugs/published/Pyrogen-and-Endotoxins-Testing--Questions-and-Answers.pdf, https://perma.cc/AH6D-LT7T (permanent link). ("Yes, firms may use alternative methods and/or procedures" for endotoxin testing, and specifically mentioning "Recombinant Horseshoe Crab Factor C Assay," where "shown to achieve equivalent or better results" (citing various USP Chapters)).

[13] *See* Deborah Cramer, *Inside the Biomedical Revolution to Save Horseshoe Crabs and the Shorebirds that Need Them*, Nat'l Audubon Soc'y (2018), https://www.audubon.org/magazine/summer-2018/inside-biomedical-revolution-save-horseshoe-crabs, https://perma.cc/96SE-YRPA (permanent link); Ex. F at 3 (Eli Lilly Report, noting "[b]y 2020, Lilly intends to transition 90 percent of our endotoxin tests to the synthetic compound," saving "on the order of several thousand horseshoe crabs" per year).

[14] *See* Citizen Petition to FDA by Charles River Laboratories, August 2, 2022, *available at* https://www.regulations.gov/document/FDA-2022-P-1764-0001 (last visited Mar. 13, 2023).

Charles River harvested roughly ███ crabs per year from South Carolina, storing between ██ ███ % of its harvest—around ███ crabs—in ponds each year before bleeding. *Id.*

Charles River ████████████████████████████████ ███ —roughly ████████████████████████████████████ ████████████████████████████████. *See* IC Ex. H at 1–2. This will likely ██████████████████████████████████████ ████████████████ (based on the percentage of crabs held in ponds between 2019 and 2022, *see* IC Ex. C at 3).

Most—if not all—of the crabs stored in ponds are taken from or adjacent to red knot stopover beaches and proposed critical habitat. *See* Niles Decl. ¶¶ 48–53 & n. 13. "Given the proximity of the harvest to stopover sites, harvesters are removing crabs for pond storage that would otherwise be laying eggs" on beaches that could be consumed by red knots. *Id.* ¶ 50. "The removal of these crabs for pond storage deprives red knots of their eggs." *Id.*



***Figures 3 (above) and 4 (below)*** [PLTF045180 and PLTF045182]. Red knots, identifiable in the foreground of *Figure 4*, and other shorebirds forage in the surf around a few horseshoe crabs on Turtle Island, while harvesters push their boat by the flock and harvest crabs in the background. Given that the ███████████████████████ ████, IC Ex. C at 3, it is ███████████████████████.



The evidence produced in discovery indicates that harvesters often take crabs for pond storage *while* red knots are present and foraging for their eggs. *See* Fig. 3–4; Niles Decl. ¶ 58. That harvesters take food directly from red knots causes harms beyond food deprivation, likely disturbing and possibly "flushing" the birds. Niles Decl. ¶ 58; *see also id.* n.15 (defining "flushing"). Red knots disturbed in this manner will perceive a threat and may stop foraging or leave the beach. *Id.* ¶ 58. This wastes critical time and energy during the short time when red knots must build body mass. *Id.* As an SCDNR shorebird biologist observed, "[r]esting and

feeding undisturbed is crucial [for SC red knots] to make it to their nesting grounds and surviv[e]." Ex. G at 3. Yet harvesters for Charles River observed by the Service "flush any and all birds present" and "disturb red knots foraging." Draft CD for Cape Roman at 3, 16.

Charles River provides ███████████████████████████████ for storage in ponds, paying ████████████████████████████████████████████████████████████ ██████████" IC Ex. I. Although SCDNR does not require pond operators to record the sex of crabs held in containment ponds, IC Ex. C at 3; ECF No. 42-1 at 4, evidence suggests that ████████████████████████████████████.[15] This would mean ponds have stored around ██████████████████████████ each spring since 2019, *see id.*,[16] when the ████████ ████████████ and the totals of ████████████████████████████. At those rates, ponds likely deprive red knots of ██████████████ crab eggs each spring.[17] Because each red knot must consume several hundred thousand crab eggs during its stopover, Niles Decl. ¶ 29, removing ██████████████ crab eggs, conservatively, removes the food needed by ██████████████ red knots each spring at current harvest levels. What is more, red knots depend not simply on the

---

[15] Assuming that the sex ratios of crabs held in ponds before bleeding are the same as the sex ratios of crabs delivered for bleeding—a plausible assumption given that ████████████████████ ████████, IC Ex. C at 3–4—then roughly ████ percent of crabs held in ponds are female. *See id.*

[16] The number of female crabs in ponds was estimated by multiplying annual containment pond totals since 2019, *see* IC Ex. C at 3, by the likely share of females, ██%, *see supra* note 15.

[17] According to Dr. Brockmann, adult female crabs in South Carolina likely lay over 80,000 eggs in a spawning season, while ponds and ████████████████████████ likely prevent crabs from spawning on beaches for the remainder of the season. Brockmann Decl. ¶¶ 14, 41–51. Even assuming that pond-held crabs nevertheless lay *half* their eggs on beaches, pond use would still remove nearly ██████████ eggs from beaches (██████ females in ponds x 40,000 eggs/female = ██████████████ eggs).

14

number of horseshoe crab eggs available at a stopover site but on a super-abundance of such eggs, because horseshoe crab eggs buried beneath the sand are inaccessible to the birds. *Id.* ¶ 36.

As the graph below shows, the ███████████████████████████████████ ███████████████████████████. According to Dr. Niles, ███████████████████ ███████████ red knots stopping over on South Carolina beaches must feed on a super-abundance of crab eggs to build weight. Niles Decl. ¶ 61. Depriving red knots of such vast quantities of a critical food source, in the super-abundance required to make this food source physically accessible, ███████████████████████, "makes it highly likely that some red knots will not obtain the sustenance needed to survive their migration and breed in the Arctic." *Id.* ¶ 67. It is "highly likely that horseshoe crab containment ponds have caused the death of red knots and prevented others from reproducing by depriving the birds of a critical food source." *Id.* ¶ 69.[18]



***Figure 5.*** ██████████████████████████████████████████████

---

[18] These harms that will worsen if ████████████████████████████████████ ████████████████████. *Id.* ¶ 69.

III.    **The Harvest-for-Ponds Effectively Operates Outside the Law, with SCDNR's Tacit
        Approval.**

The horseshoe crab fishery is an atypical one. Given the ecological importance of
horseshoe crabs, the South Carolina legislature requires that crabs harvested for biomedical
bleeding "must be handled so as to *minimize injury* to the crab" and "must be *returned unharmed*
to state waters of comparable salinity and water quality as soon as possible after bleeding," S.C.
Code § 50-5-1330(C) (emphasis added). SCDNR is tasked with enforcing the statute, *id.* § 50-5-
1330(A)–(C), and issues separate permits each spring for harvesting crabs, ECF No. 1-4, and for
storing them in ponds, ECF No. 1-1 at 22–23.

The use of containment ponds in South Carolina effectively operates outside the law.
Charles River's agents treat crabs in a reckless manner from harvesting through pond storage and
release of surviving crabs. Brockmann Decl. ¶¶ 23–61; ECF No. 67 at 12–16. Documents from
SCDNR show that ███████████████████████████████, including ███████████
████████████████, IC Ex. C at 5, with ███████████████████████████
███████████████████. *See* ECF No. 71 at 8–9 (see unredacted brief). SCDNR
has long been aware of these problems. *See* IC Ex. C at 5 (SCDNR's own ████████ data).
Indeed, they have been publicly reported, including the unlawful handling of crabs and illegal
harvesting on closed islands.[19] Yet there is no evidence that the agency has *ever* charged any
horseshoe crab permittee or revoked any permit for any one of the systematic violations of
statutory and permit conditions in this fishery. Instead, year after year, SCDNR has re-issued
permits and sent letters to ███████████ finding that "████████████████████████

---

[19] *See, e.g.*, Chiara Eisner, *South Carolina restricted the horseshoe crab harvest. The lab moved
north for more blood* (May 6, 2022), The State, https://www.thestate.com/news/state/south-
carolina/article260986517.html; *see also* Ex. H at 8, 11–12, 14 (internal pagination cited here).

██████████████████████████████████████" IC Ex. F at 1, 2, 3, 5, 7; *accord* ECF Nos. 85-1, 85-2 & 85-3 (████████████ in public documents that "[n]o significant issues regarding handling crabs and holding facilities arose during this season.").

As noted, SCDNR issues permits that authorize the holding of crabs in ponds for Charles River. When Plaintiffs filed this case, SCDNR placed no restrictions on the sex of crabs held in ponds. ECF No. 1-1 at 23 (2021 pond permit). After Plaintiffs filed this case, SCDNR for the first time prohibited female crabs from being stored in ponds, requiring instead that females be taken directly from beaches to bleeding. ECF No. 42-1 at 4; *see also* Ex. E at 5.

SCDNR's own data indicates that ████████████████████████████████ ████████████████████████████████████████. IC Ex. C at 5. Although, as noted, SCDNR does not require pond permittees to record the sex of all crabs held in ponds, *id.* at 3, the available evidence suggests that ████████████████████ ████████████████████. *See* Brockmann Decl. ¶¶ 52–58. More broadly, after supposed permit improvements to protect crabs in ponds, *see* ECF No. 42-1 at 4, ████████████████ ████████████████. *See* IC Ex. C at 5.



In sum, pond storage ensures that ████████████ crabs are *not* "handled so as to minimize injury" or "returned unharmed" to state waters, S.C. Code § 50-5-1330(C), and horseshoe crab permit conditions are often ignored and ineffective. Instead of enforcing the law or revoking permits, *see* ECF No. 42-1 at 4 ("Failure to comply with any of the above conditions can result in revocation of this permit."), SCDNR has just indicated that it plans to re-issue new pond permits for the 2023 season later this week, Ex. I, apparently ████████████. This creates an imminent likelihood of unauthorized incidental "take" of red knots, necessitating a preliminary injunction to prevent this take.

## LEGAL FRAMEWORK

### I.    The Endangered Species Act.

"In response to growing concern over the extinction of many animal and plant species,

Congress enacted the Endangered Species Act of 1973." *Gibbs v. Babbitt*, 214 F.3d 483, 487 (4th

Cir. 2000) (citation omitted). Congress' response was "powerful and substantially unequivocal."

*Loggerhead Turtle v. Cty. Council of Volusia Cty.*, 148 F.3d 1231, 1246 (11th Cir. 1998)

(citation and quotations omitted). Indeed, the ESA is "the most comprehensive legislation for the

preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437

U.S. 153, 180 (1978) ("*TVA*").

"'The plain intent of Congress in enacting this statute . . . was to halt and reverse the

trend toward species extinction, whatever the cost. This is reflected not only in the stated policies

of the Act, but in literally every section of the statute.'" *Babbitt v. Sweet Home Chapter of*

*Cmtys. for a Great Ore.*, 515 U.S. 687, 699 (1995) (quoting *TVA*, 437 U.S. at 184).

"[E]xamination of the language, history, and structure of the legislation . . . indicates beyond

doubt that Congress intended endangered species to be afforded the highest of priorities." *TVA*,

437 U.S. at 174.

Recognizing these species' "esthetic, ecological, educational, historical, recreational, and

scientific value to the Nation and its people,"16 U.S.C. § 1531(a)(3), the ESA set out "to provide

a means whereby the ecosystems upon which endangered species and threatened species depend

may be conserved [and] to provide a program for the conservation of such endangered species

and threatened species," *id.* § 1531(b). The purpose of the statute is to recover these species to

the point at which they no longer require its protections. *See id.* § 1532(3) ("conservation" and

"conserve" mean "to use and the use of all methods and procedures which are necessary to bring

any endangered species or threatened species to the point at which the measures provided pursuant to [the ESA] are no longer necessary").

In pursuing these objectives, Section 9(a)(1)'s "take" prohibition is the "cornerstone" of the statute. *Gibbs*, 214 F.3d at 487. That section prohibits any person from committing the unauthorized "take" of any endangered species. 16 U.S.C. § 1538(a)(1)(B). It also prohibits any person to cause unauthorized take to be committed by another. *Id.* § 1538(g). This prohibition extends to state agencies issuing permits for otherwise-lawful activities that result in the unauthorized take of an endangered species. *Strahan v. Coxe*, 127 F.3d 155, 163–64 (1st Cir. 1997). The Secretary of the Interior may extend "take" prohibitions to threatened species, *id.* § 1533(d), as it has done for the threatened red knot, *see* Endangered and Threatened Wildlife and Plants; Threatened Species Status for the Rufa Red Knot, 79 Fed. Reg. 73,706, 73,728 (Dec. 11, 2014).

The legislative history "make[s] clear that Congress intended 'take' to apply broadly," *Babbitt*, 515 U.S. at 704—indeed, "in the broadest possible manner to include every conceivable way in which a person can 'take' or attempt to 'take' any fish or wildlife." S. Rep. No. 93-307, 1973 WL 12683, at *2,995 (1973).

Consonant with that intent, the ESA defines "take" as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). Relevant here, take by "harass[ment]" means "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding or sheltering." 50 C.F.R. § 17.3. And take by "harm" includes "significant

habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering." *Id.*

"Congress understood § 9(a)(1)(B) to prohibit indirect as well as deliberate takings." *Babbitt*, 515 U.S. at 700. Thus, "activities not intended to harm an endangered species . . . may constitute unlawful takings under the ESA . . . ." *Id.* at 701.

The Service may authorize incidental take that results from an otherwise-lawful activity in one of two ways, either through an incidental take statement issued with a biological opinion following formal consultation on a federal agency action, 16 U.S.C. §1536(b)(4), or through an incidental take permit where no federal agency action is involved. *Id.* § 1539(a)(1)(B).

## II.    <u>Standard of Review</u>

### a.    <u>Preliminary Injunction</u>

A preliminary injunction "preserve[s] the relative positions of the parties until a trial on the merits can be held." *United States v. South Carolina*, 720 F.3d 518, 524 (4th Cir. 2013) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). A plaintiff is entitled to that remedy upon showing "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (quoting *Winter v. NRDC*, 555 U.S. 7, 20 (2008)).

### b.    <u>Endangered Species Act</u>

As noted, the ESA "afforded the highest of priorities" to protecting listed species. *TVA*, 437 U.S. at 180. In ESA cases, the judgment of Congress guides the preliminary injunction analysis, where courts' highest priority is preventing harm to listed species while the case plays out. *See e.g.*, *Sierra Club v. Von Kolnitz*, No. 2:16-cv-03815, 2017 WL 3480777, at *8 (D.S.C.

Aug. 14, 2017) (Norton, J.) ("[G]iven the unique confines on preliminary injunctions in ESA

actions," the "'equitable scales are <u>always</u> tipped in favor of the endangered or threatened

species, and the balance of hardships and the public interest <u>tips heavily</u> in favor of protected

species.'" (emphasis in original) (quoting *Red Wolf Coal. v. U.S. Fish & Wildlife Serv.*, 210 F.

Supp. 3d 796, 806 (E.D.N.C. 2016)); *Am. Rivers v. U.S. Army Corps of Eng'rs*, 271 F. Supp. 2d

230, 249 (D.D.C. 2003) (on preliminary injunction, courts respect that "Congress spoke in the

'plainest of words' in enacting the ESA, 'making it abundantly clear that the balance has been

struck in favor of affording endangered species the highest of priorities.'" (*quoting TVA*, 437

U.S. at 194)); *Cottonwood Env't L. Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1091 (9th Cir. 2015)

("[T]he equities and public interest factors always tip in favor of the protected species.").

## **ARGUMENT**

Plaintiffs have made a clear showing on each of the four factors warranting preliminary

injunctive relief.

## I.    **Plaintiffs Are Likely to Succeed on the Merits.**

### a.    **Plaintiffs Have Standing.**

As a threshold matter, Plaintiffs have standing to bring this case. An organization has

standing to sue "either based on an injury to the organization in its own right or as the

representative of its members who have been harmed." *Friends of the Earth, Inc. v. Gaston

Copper Recycling Corp.*, 204 F.3d 149, 155 (4th Cir. 2000) (en banc). An organization has

standing to sue on behalf of its members when "(1) at least one of its members would have

standing to sue in his own right; (2) the organization seeks to protect interests germane to the

organization's purpose; and (3) neither the claim asserted nor the relief sought requires the

participation of individual members in the lawsuit." *Id.* (citation omitted). Under this prong,

individual members have standing if "(1) [they have] suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 283 (4th Cir. 2018) (citation and quotations omitted).

"In the environmental litigation context, the standing requirements are not onerous." *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 517 (4th Cir. 2003). "This is so because [t]he extinction of a species, the destruction of a wilderness habitat, or the fouling of air and water are harms that are frequently difficult or impossible to remedy by monetary compensation." *Beck v. McDonald*, 848 F.3d 262, 274 n.5 (4th Cir. 2017) (citation and quotations omitted). "Threats or increased risk … constitute[] cognizable harm." *Friends of the Earth*, 204 F.3d at 160; *accord Beck v. McDonald*, No. 3:13-cv-999-TLW, 2015 WL 13777969, at *9 (D.S.C. Mar. 31, 2015), *aff'd*, 848 F.3d 262 (4th Cir. 2017). "[T]he desire to use or observe an animal species, even for purely aesthetic purposes, is undeniably a cognizable interest for purposes of standing." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992) "[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000) (citation and quotations omitted).

Plaintiffs' members visit beaches around South Carolina each spring to enjoy, observe, photograph, and, in the case of Mr. Crolley, conduct an ecotourism business involving migrating red knots and spawning horseshoe crabs. *See* Ex. J, Declaration of Chris Crolley ("Crolley

Decl.") ¶¶ 5–13, 18; Ex. K, Declaration of Daniel Prohaska ("Prohaska Decl.") ¶¶ 13–14; Ex. L, Declaration of Dana Beach ("Beach Decl.") ¶¶ 3–8, 11–12. Their interests are harmed by Charles River's removal and containment of around ████ crabs each spawning season, which depletes red knots' critical food source, horseshoe crab eggs. *See* Prohaska Decl. ¶¶ 17, 19; Crolley Decl. ¶¶ 14–21; Beach Decl. ¶¶ 9–16. These members' interests are also harmed by the ████████ ████████████████████████ versus on South Carolina beaches, where they would be able to observe red knots during planned future birding trips to look for birds feeding on horseshoe crab eggs. *See* Prohaska Decl. ¶¶ 13–17; Beach Decl. ¶¶ 14–16; Crolley Decl. ¶¶ 16–18; Ex. M, Declaration of Christian Hunt ("Hunt Decl.") ¶ 16.

These members fear the harvest for containment ponds has contributed to the marked declines in red knot and horseshoe crab abundance that they have observed over the years, which lessens their enjoyment of their trips to South Carolina beaches and "lost clients" for an ecotourism business. Crolley Decl. ¶¶ 18–22; Prohaska Decl. ¶¶ 17–18; Beach Decl. ¶¶ 13–16. Because "reasonable concerns about the effects of [the challenged conduct] directly affected [members'] recreational, aesthetic, and economic interests," Plaintiffs' members have standing. *Laidlaw*, 528 U.S. at 183–84. These injuries are caused by Charles River's use and SCDNR's authorization of containment ponds and would be redressed if the Court enjoins such ponds. *See, e.g.,* Crolley Decl. ¶ 23; Beach Decl. ¶ 16.[20]

**b.  Plaintiffs Are Likely to Succeed on Their Section 9 Claims.**

Plaintiffs are likely to succeed on their claims that SCDNR and Charles River are in violation of Section 9's prohibition against unauthorized incidental take of red knots. The harvest

---

[20] Plaintiffs also have organizational standing to pursue their claims. *See generally* Hunt Decl. ¶¶ 8–11.

of spawning horseshoe crabs for storage in containment ponds while red knots are present on the

beach causes unauthorized incidental take by harassing red knots and disrupting feeding and

sheltering behaviors. The removal of spawning horseshoe crabs and their storage in containment

ponds deprives red knots of a critical food source on stopover beaches, causing unauthorized

incidental take via harm that actually kills or injures red knots by impairing their feeding and

breeding ability. Because neither SCDNR nor Charles River has obtained authorization from the

Service for this incidental take, both are in violation of Section 9.

Section 9(a)(1) prohibits causing or committing the unauthorized "take" of the red knot.

16 U.S.C. § 1538(a)(1)(B), (g). As noted above, the ESA defines "take" as "to harass, harm,

pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such

conduct." 16 U.S.C. § 1532(19). Relevant here, take by "harass[ment]" means "an intentional or

negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such

an extent as to significantly disrupt normal behavioral patterns which include, but are not limited

to, breeding, feeding or sheltering." 50 C.F.R. § 17.3. And take by "harm" includes "significant

habitat modification or degradation where it actually kills or injures wildlife by significantly

impairing essential behavioral patterns, including breeding, feeding, or sheltering." *Id.*

As explained above, containment ponds likely remove ███████████ crab eggs from

red knot feeding beaches each spring—roughly the amount of food needed by ██████████ red

knots. *See supra* at 14. Again, it is not just the sheer number of eggs that are removed, but also

that removal of spawning crabs depletes the super-abundance of eggs necessary for red knots to

successfully feed. Brockmann Decl. ¶ 51. According to Dr. Niles, depriving red knots of such

vast quantities of a critical food source makes it "highly likely" that red knots stopping over in

South Carolina will be too frail to survive their migration to the Arctic and breed, causing death and lower rates of reproduction. Niles Decl. ¶ 67.

SCDNR's new permit conditions have not addressed the problems with containment ponds. Last year, when ███████████████████████████, they were still ██████████████████████. *See* IC Ex. C at 5; Brockmann Decl. ¶¶ 52–54. There is even documentation of spawning in containment ponds. *See* Brockmann Decl. ¶¶ 41–44. Documents from the pond operators ████████████ demonstrate that there has historically been ████████████████████████████████████████████████ ██████. *See* IC Ex. J. Moreover, horseshoe crab containment ponds, ████████████ ████████████████, likely prevent crabs from spawning for the remainder of the season even after release, Brockmann Decl. ¶¶ 48–51, further depriving red knots of critical crab eggs in the super-abundance needed to make them accessible. Niles Decl. ¶¶ 63–65.

Containment ponds thus cause incidental take of red knots by directly removing spawning horseshoe crabs from stopover beaches—where red knots need to feed on a super-abundance of accessible eggs to renourish and restore their bodies, survive their migration to the Arctic Circle and breed once they arrive—to containment ponds, where this critical food source is inaccessible to the birds. Neither SCDNR nor Charles River has sought or obtained federal authorization for this incidental take.

ESA regulations defining take by "harm" and "harass[ment]" specifically include impacts to an animal's feeding, breeding, and sheltering patterns. 50 C.F.R. § 17.3. By depriving red knots of the super-abundance of horseshoe crab eggs on stopover beaches they need, the use of containment ponds to store spawning horseshoe crabs is causing death and reduced reproductive ability. Niles Decl. ¶¶ 66–69. At the motion to dismiss stage, this Court held that Plaintiffs'

allegations regarding the deprivation of critical horseshoe crab eggs as a result of containment ponds plausibly asserted a "take" of red knots. *Defs. of Wildlife v. Boyles*, 608 F. Supp. 3d 336, 346 (D.S.C. 2022) ("These facts allow the Court to draw the reasonable inference that Defendants' use and authorization of containment ponds significantly disrupt the normal feeding patterns of red knots."). Plaintiffs have now submitted evidence establishing that the harvest for containment ponds is ██████████████████████ as Plaintiffs' Complaint alleged, and thus birds are being ████████████████████████ as alleged in the Complaint.

On the stopover beaches, moreover, harvest of crabs for pond storage while red knots are present likely "annoy[s] [red knots] to such an extent as to significantly disrupt normal behavioral patterns," including feeding and sheltering. 50 C.F.R. § 17.3 (definition of "harass"); *see* Niles Decl. ¶ 58 (harvest for ponds while red knots are present may disturb red knots and cause them to flush); *accord* Draft CD for Cape Romain at 3, 16. The removal of spawning horseshoe crabs to containment ponds "actually kills or injures" red knots through "significant habitat modification or degradation [that] significantly impair[s] essential behavioral patterns, including breeding and feeding," 50 C.F.R. § 17.3 (definition of "harm"). Charles River is thus liable for the unauthorized incidental take of red knots resulting from the harvest of spawning horseshoe crabs for ponds that both harasses and harms red knots.

When an agency "allows or authorizes acts that exact a taking and that, but for the permitting process, could not take place," the agency too is liable under Section 9. *Strahan*, 127 F. 3d at 163–64 (Massachusetts liable for take of endangered right whales by authorizing state fishery that risked entangling them). It is undisputed that SCDNR authorizes containment ponds, which could not lawfully be used without an SCDNR permit. S.C. Code Ann. § 50-5-1330(A) ("Taking or possessing horseshoe crabs (Limulus polyphemus) is unlawful except under permit

granted by the department."). By authorizing activities that cause the incidental take of red knots, SCDNR is causing others to commit unauthorized incidental take.[21] *See, e.g., Loggerhead Turtle,* 148 F.3d at 1251–53 (county violated section 9 by authorizing beachfront lighting in turtle nesting areas that resulted in take of endangered turtles); *Red Wolf Coal. v. N.C. Wildlife Res. Comm'n,* No. 2:13–CV–60–BO, 2014 WL 1922234, at *7–9 (E.D.N.C. May 13, 2014) (state commission likely in violation of section 9 by authorizing hunting practices for coyotes that risked mistaken shootings of endangered red wolves); *Animal Welfare Inst. v. Martin,* 588 F. Supp. 2d 70, 98–100 (D. Me. 2008) (state agency likely violated Section 9 by approving traps that risked incidentally trapping threatened lynx); *United States v. Town of Plymouth,* 6 F. Supp. 2d 81, 90–92 (D. Mass. 1998) (town likely violated Section 9 by authorizing off-road vehicles on beach that risked harming piping plover's nesting and feeding habitat).

In Section 9, Congress defined the "take" prohibition "'in the broadest possible manner to include every conceivable way in which a person can 'take' or attempt to 'take' any fish or wildlife,'" including "indirect as well as deliberate takings." *Babbitt,* 515 U.S. at 700, 704–05 (quoting S. Rep. No. 93–307, p. 7 (1973)). Under these standards, Plaintiffs are likely to succeed

---

[21] SCDNR is well aware that ███████████████████████████████████. *See* IC Ex. J (███████████████████████████████████████████. SCDNR is also ███████████████████████████ *See* IC Ex. C at 3–5. SCDNR did nothing to ███████████████████████████████. *See* IC Ex. J. Thus, SCDNR may not rely on its permit conditions as a defense when it has ██████████████ for years. *See supra* at 3, 16–17; *see also, e.g., Animal Prot. Inst. v. Holsten,* 541 F. Supp. 2d 1073, 1076–80 (D. Minn. 2008) (concluding that state officers may be liable for lynx takings that are incidental to the trapping activities because "[i]n order to legally engage in trapping in Minnesota . . . one must obtain a license and follow all governmental regulations governing trapping activities").

on their claims that Charles River's use and SCDNR's authorization of containment ponds cause the unauthorized incidental take of red knots via harm and harassment.

## II.     <u>Plaintiffs Are Likely to Suffer Irreparable Harm If a Preliminary Injunction is Not Granted.</u>

"Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987); *see also Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 201 (4th Cir. 2005). This case is no exception. In the absence of an injunction, the continued use and authorization of containment ponds will result in the unauthorized incidental take of listed red knots, thus causing irreparable harm to the birds and Plaintiffs' members.

"Irreparable harm should be determined by reference to the purposes of the statute being enforced." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 818 (9th Cir. 2018); *see also Amoco*, 480 U.S. at 544 (irreparable harm inquiry requires consideration of the "purpose" and "underlying substantive policy" of the act). For the ESA, that purpose is the protection of endangered and threatened species. *See TVA*, 437 U.S. at 184 (noting Congress' desire in ESA to "halt and reverse the trend toward species extinction, whatever the cost"). The threshold for establishing irreparable harm in ESA cases is low. *See Cottonwood,* 789 F.3d at 1091 ("In light of the stated purposes of the ESA in conserving endangered and threatened species and the ecosystems that support them, establishing irreparable injury should not be an onerous task for plaintiffs."), *cert. denied*, 137 S. Ct. 293 (2016); *see also Sierra Club,* 2017 WL 3480777, at *6 ("Generally, courts have found that there is a strong showing of irreparable harm in cases involving the ESA.").

Charles River's use, and SCDNR's authorization, of containment ponds violate the very purposes of the ESA to conserve listed species like the red knot, i.e., to ensure that the species

recovers to the point that the ESA's protections are no longer needed, including by ensuring that any incidental take is lawfully authorized. Thus, the irreparable injury prong of the injunction analysis is easily satisfied.

### a. Irreparable Harm to Red Knots.

An injunction is necessary to prevent irreparable injury to threatened red knots and Plaintiffs' members' interests in seeing and enjoying red knots. Absent an order preliminarily enjoining SCDNR's authorization and Charles River's use of containment ponds, red knots will again be deprived of the super-abundance of horseshoe crab eggs that they rely upon during the pendency of this litigation. Without this vital food supply, the red knots' survival rate along their migration will be significantly diminished and the individual birds will be less likely to survive and reproduce.

As this District has recognized, in the ESA context, interference with survival and reproductive capability is an irreparable harm. In 2017, Judge Norton held that a temporary sea wall caused irreparable harm because it blocked female sea turtles from reaching some nesting sites, reducing the chance of successful reproduction. *Sierra Club,* 2017 WL 3480777, at *7. Similarly, in *Red Wolf Coalition v. U.S. Fish & Wildlife Service*, another court in this Circuit found that an increased likelihood of mortality in a small, endangered population constitutes irreparable harm. 210 F. Supp. 3d at 805–06.

The harms to red knots imposed by the use and authorization of containment ponds to store spawning horseshoe crabs are similarly irreparable. Red knots are already in decline, and containment ponds remove the super-abundance of horseshoe crab eggs that red knots rely on from stopover beaches. Niles Decl. ¶ 59. Moreover, Charles River's harvest for containment ponds harasses red knots when horseshoe crabs are removed from stopover beaches at the precise

moment that crabs are laying the eggs upon which red knots depend. Niles Decl. ¶ 58 The super-abundance of horseshoe crab eggs—eggs on which red knots have evolved to rely for their survival—will again be displaced from South Carolina's beaches, and therefore removed from vulnerable red knots. *Id.* ¶¶ 66–69; Brockmann Decl. ¶ 50–51. Without access to these vital eggs, red knots will be less likely to survive their migration and successfully breed at their destination. Niles Decl. ¶ 47. This is unquestionably irreparable harm to a listed species under the ESA.

**b. Harm to Plaintiffs' Members' Interests.**

A plaintiff's aesthetic and recreational interests are harmed by actions that impair his or her enjoyment of the environment. *Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978, 995–96 (8th Cir. 2011) (finding that construction of a power plant harmed plaintiffs by "interfer[ing] with [their] interests in studying and enjoying the environment"). Thus, a plaintiff is harmed by actions that impair his or her ability to enjoy wildlife in its natural environment. *See, e.g., Humane Soc'y of the U.S. v. Hodel*, 840 F.2d 45, 52 (D.C. Cir. 1988) (finding harm where action would "deplet[e] the supply of animals and birds that refuge visitors seek to view"); *Fund for Animals, Inc. v. Lujan*, 962 F.2d 1391, 1396 (9th Cir. 1992) (finding that "the diminished opportunity of the Fund's members to view the northern bison herd in Yellowstone establishes standing to challenge the 1990 bison management plan").

The harms to red knots identified above will impair Plaintiffs' members' abilities to watch, enjoy, and, in the case of Defenders' member Chris Crolley, conduct a tourism business based on the species. For example, Mr. Crolley, the owner of Coastal Expeditions, used to run a charter trip to take birding photographers (including professionals) to see red knots gather during horseshoe crab spawning. *See* Crolley Decl. ¶ 16. In 2017, 2018, and 2019, Mr. Crolley ran the trip, but there were so few birds he has not offered this outing since then. *Id*. Defenders'

members Crolley and Daniel Prohaska, and League member Dana Beach, all make special birding trips to look for red knots, including specific planned future trips to South Carolina stopover beaches. *See* Crolley Decl. ¶ 18, Prohaska Decl. ¶¶ 15–16, Beach Decl. ¶ 6. If red knots are no longer present and foraging on South Carolina beaches, or are present in even sparser numbers, these members will lose a special part of what it means to them to live in South Carolina and visit South Carolina beaches. *See* Prohaska Decl. ¶ 18; Crolley Decl. ¶ 19; Beach Decl. ¶ 8. Dana Beach photographs red knots and advocates for their protection. If containment ponds continue to result in unauthorized incidental take of red knots, it will interfere with Mr. Beach's ability to observe, enjoy and learn about these birds. Beach Decl. ¶¶ 7, 16.

These injuries to Plaintiffs' members' business, aesthetic, and research interests are irreparable. *See Red Wolf Coal.*, 2014 WL 1922234, at *9; *Red Wolf Coal.*, 210 F. Supp. 3d at 805; *Nat'l Wildlife Fed'n*, 886 F.3d at 822. Thus, if the Court does not enjoin this spring's use of horseshoe crab containment ponds, Plaintiffs' members will suffer irreparable harm.

## III.    The Balance of Harms Tips in Plaintiffs' Favor.

Once Plaintiffs have shown irreparable harm to an endangered or threatened species, the Court's inquiry is at an end: "[t]he equitable scales are always tipped in favor of the . . . species." *Red Wolf Coal.*, 210 F. Supp. 3d at 806 (quoting another source); *see TVA*, 437 U.S. at 194 (Congress "[made] it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities"); *see also S.C. Dep't of Wildlife & Marine Res. v. Marsh*, 866 F.2d 97, 100 (4th Cir. 1989) (stating that if there is irreparable harm to the environment, the balance of harms usually favors an injunction).

Even in the absence of this standard, the balance of equities would still favor Plaintiffs. Allowing Charles River and SCDNR to continue the unauthorized incidental take of red knots

while this suit is decided would undermine the protective purposes that animate the ESA. *See, e.g.*, *TVA*, 437 U.S. at 194. Any alleged harm Charles River and SCDNR might assert from the temporary deprivation of the "economic benefits" of containment ponds is "outweighed by . . . permanent harm to the environment." *Ohio Valley Envtl. Coal. v. U.S. Army Corps of Eng'rs*, 528 F. Supp. 2d 625, 632 (S.D.W. Va. 2007). And as shown above, Plaintiffs' harms are irreparable. *See supra* at 28–31.

On the other hand, SCDNR will not be harmed at all by an order enjoining it from permitting horseshoe crab storage ponds to be used before this litigation concludes. Any harm to Charles River from an injunction temporarily suspending the use of containment ponds in South Carolina during the pendency of this litigation does not outweigh the irreparable harm to red knots and Plaintiffs' members. Importantly, Plaintiffs do not seek to enjoin the harvest of horseshoe crabs from South Carolina beaches—only the <u>use of containment ponds</u> to store those crabs before they are taken for bleeding. Thus, Charles River may continue its harvest so long as it does not place horseshoe crabs in containment ponds—which are not even used in other states that have a robust and successful biomedical harvest.



Moreover, Charles River has already ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. As noted *supra* at 11, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, which it stated could "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." IC Ex. K. The company is "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮," *see* IC Ex. L, and has received a permit to harvest, for the first time, up to 180,000 horseshoe crabs yearly from Virginia. Ex. N at 6. Given these facts, any harm to Charles River from a limited injunction is easily outweighed by the dire harm red knots and Plaintiffs' members will suffer if the use of

storage ponds continues while this litigation proceeds. *See TVA*, 437 U.S. at 188 (in ESA cases, "[q]uite obviously, it would be difficult for a court to balance the loss of a sum certain–even $100 million–against a congressionally declared 'incalculable' value, even assuming we had the power to engage in such a weighing process, which we emphatically do not.").

IV.    <u>**Preliminary Injunctive Relief Is in the Public Interest.**</u>

As noted, "the balancing and public interest prongs have been answered by Congress' determination that the balance of hardships and the public interest tips heavily in favor of protected species." *Strahan,* 127 F.3d at 160; *see also Leatherback Sea Turtle v. Flagler Cty. Bd. of Cty. Comm'rs*, 359 F. Supp. 2d 1209, 1212 (M.D. Fla.2004) (finding that, "given the monumental and important aims of the ESA, Congress effectively removed from the courts their traditional equitable discretion in injunction proceedings"); *see also S.C. Dep't of Wildlife & Marine Res.*, 866 F.2d at 100 (stating that if there is irreparable harm to the environment, the balance of harms usually favors an injunction). The protection of ESA-listed species is in the public interest because of their "'esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people.'" *Gibbs*, 214 F.3d at 487 (quoting 16 U.S.C. § 1531(a)(3) (1994)).

Even if the balance had not been struck by Congress, the result would be the same. Because the red knot is a species "highly vulnerable to extinction," Niles Decl. ¶ 10, its protection through compliance with statutory requirements, including the requirement to comply with the statutory prohibitions against unauthorized incidental take, is of vital importance to the public's interest in ensuring the species' survival and ultimate recovery.

Temporarily enjoining SCDNR from authorizing, and Charles River from using, containment ponds for the pendency of this litigation is in the public interest. Charles River may

continue to harvest horseshoe crabs so long as it does not place them into containment ponds, and thus, may continue to supply LAL to its customers. *See supra* at 32. Charles River has also taken steps ███████████████████████, and to harvest and bleed even more crabs in other states. *Id*. Moreover, even during the height of the pandemic in 2021, Charles River repeatedly assured the public that it "can test the anticipated 5 billion doses of the most coveted COVID-19 vaccine" from "just a single day's production of LAL." Ex. O at 1. Thus, even a global pandemic "'place[d] no undue burden on the [lysate] supply chain.'" Ex. P at 3 (quoting Charles River official). In a letter co-authored in 2021, the company explained that "only a very small amount of LAL is needed to perform [endotoxin] tests;" that "[i]t takes roughly the same amount of LAL to test 1,000 doses as it does to test 100,000 doses;" and that "the demands of [] testing materials worldwide can and are being absorbed with available inventory and without a significant negative impact on the pharmaceutical industry or supply chain." Ex. Q at 4–5. Indeed, ██████████ ██████████████████████████████████████. IC Ex. C at 3–4. A mere injunction on containment ponds, not even against the harvest, thus will have no impact on the public interest. By contrast, an injunction on containment ponds will have critically important public interest benefits for the ability of listed red knots to obtain the super-abundance of horseshoe crab eggs that they need to survive and reproduce.

Finally, the public interest cannot support allowing a company to continue practices that routinely violate state laws. As explained *supra,* Charles River's practices in harvesting, transporting, holding, and releasing crabs all violate South Carolina law and the Atlantic States Marine Fisheries Commission, a multi-state fisheries management cooperative, best management practices for handling horseshoe crabs. *See* Brockmann Decl. ¶¶ 21–51. Charles River also

██████████████████████████████████████████████████

████. *Compare*, IC Ex. C at 5, *with* IC Ex. M (█████████████████████████████████

█████████████████████████████████████████████"); *see also Defs. of Wildlife v.*

*U.S. Fish & Wildlife Serv.*, 539 F. Supp. 3d 543, 559–60 (D.S.C. 2021) ("*Defenders*")

(considering known illegal crab harvests by Charles River's agent), *appeal dismissed sub nom.*

*Defs. of Wildlife v. Charles River Lab'ys Int'l, Inc.*, 2021 WL 6330714 (4th Cir. Aug. 24,

2021).[22]

## V.    <u>No Bond Should Be Required.</u>

Federal Rule of Civil Procedure 65(c) requires that Plaintiffs post security. But "where

plaintiffs are public interest groups who might otherwise be barred from obtaining meaningful

judicial review," a nominal bond suffices. *Red Wolf Coal.*, 210 F. Supp. 3d at 806–07; *see also*

*Defenders*, 539 F. Supp. 3d at 560–61. Here no bond, or at most, a nominal bond, should be

required consistent with these cases.

## <u>CONCLUSION</u>

For the above reasons, Plaintiffs respectfully request that this Court grant this Motion for

Preliminary Injunction of SCDNR's authorization of, and Charles River's use of, horseshoe crab

containment ponds pursuant to the 2023 Possession Permit (or any other authorization).

---

[22] In *Defenders*, Plaintiffs obtained a preliminary injunction of Charles River's unlawful harvest of horseshoe crabs from the Cape Romain National Wildlife Refuge without the special use permit required by federal law, and in violation of other provisions of federal law. While the Fourth Circuit ultimately stayed this ruling late in the horseshoe crab harvest season, the appellate court did not provide a rationale. In the end, Cape Romain remained closed, and that litigation was dismissed as moot when the Service made an announcement that the Refuge would remain closed to horseshoe crab harvesting absent a special use permit. All applications for such permits to this point have been denied, and the Service just issued a proposed finding that crab harvesting is incompatible with the Refuge's purposes to, *inter alia*, protect threatened red knots. *E.g.*, Draft CD for Cape Romain at 13–14 (citing, e.g., "reduction in food availability for the birds in the short and long term, [and] increased bird flushing" due to horseshoe crab harvesting).

Respectfully submitted this 15th day of March, 2023.

s/ Catherine M. Wannamaker
Southern Environmental Law Center
525 East Bay Street, Suite 200
Charleston, South Carolina 29403
(843) 720-5270
cwannamaker@selcsc.org

Carl Brzorad
Southern Environmental Law Center
525 East Bay Street, Suite 200
Charleston, South Carolina 29403
(843) 720-5270
cbrzorad@selcsc.org

*Attorneys for Plaintiffs*