# UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
### CHARLESTON DIVISION

| | |
|---|---|
| DEFENDERS OF WILDLIFE and SOUTH CAROLINA COASTAL CONSERVATION LEAGUE,<br><br>    Plaintiffs,<br><br>  v.<br><br>ROBERT H. BOYLES, JR., in his official capacity as Director of the South Carolina Department of Natural Resources; CHARLES RIVER LABORATORIES INTERNATIONAL, INC.,<br><br>    Defendants,<br><br>  and<br><br>GAULT SEAFOOD, LLC, and MARSH POINT FARM, INC.,<br><br>    Intervenor-Defendants. | Case No. 2:22-cv-112-RMG |

## CONSENT ORDER

**TABLE OF CONTENTS**

I.      JURISDICTION AND VENUE ...................................................................3

II.     APPLICABILITY.........................................................................................3

III.    NOTICES ......................................................................................................3

IV.     BEACH CLOSURES .....................................................................................5

V.      SCDNR PERMITS ........................................................................................7

VI.     COVENANT NOT TO SUE; RELEASE.....................................................10

VII.    MONITORING AND REPORTING ............................................................11

VIII.   TRAINING ..................................................................................................16

IX.     FUNDS ........................................................................................................16

X.      NOTICE TO AGENTS, EMPLOYEES, AND/OR INDEPENDENT
CONTRACTORS OF CHARLES RIVER AND POND OPERATORS.........................17

XI.     ENFORCEMENT, VICARIOUS LIABILITY, AND DISPUTE RESOLUTION 17

XII.    DOCUMENT RETENTION, RETURN, AND DELETION ...............................20

XIII.   EXTENSION OF THE AGREEMENT .......................................................21

XIV.    JOINT STATEMENT ..................................................................................21

XV.     ENTIRE AGREEMENT ..............................................................................21

XVI.    SIGNATURES .............................................................................................21

XVII.   EXHIBITS ...................................................................................................22

i

## RECITALS

WHEREAS, on January 13, 2022, Plaintiffs Defenders of Wildlife ("DOW") and South Carolina Coastal Conservation League ("SCCCL") (collectively, "Plaintiffs") filed this citizen suit captioned *Defenders of Wildlife et al.* v. *Boyles et al.*, No. 2:22-112-RMG (the "Action") under the Endangered Species Act ("ESA"), 16 U.S.C. § 1540(g)(1)(A), against Robert H. Boyles, Jr. in his official capacity as Director of the South Carolina Department of Natural Resources (together with his successors, "SCDNR") and Charles River Laboratories International, Inc. ("Charles River"), seeking, *inter alia*, a declaration that the authorization and use of horseshoe crab holding ponds in South Carolina violates Section 9 of the ESA, 16 U.S.C. § 1538(a)(1)(B), by causing the unpermitted "take" of *rufa* red knots, and an injunction against the authorization and use of horseshoe crab holding ponds in South Carolina;

WHEREAS, SCDNR and Charles River deny that they have violated Section 9 of the ESA, 16 U.S.C. § 1538(a)(1)(B), and further deny that they have engaged in any activities that cause an unpermitted "take" of *rufa* red knots;

WHEREAS, on March 15, 2023, Plaintiffs filed a motion for a preliminary injunction (the "PI Motion") against the authorization and use of horseshoe crab holding ponds in South Carolina;

WHEREAS, on March 29, 2023, Intervenor-Defendants Gault Seafood, LLC and Marsh Point Farm, Inc. (collectively, "Pond Operators"; and together with Charles River and SCDNR, the "Defendants"; and together with Plaintiffs, SCDNR, and Charles River, the "Parties") filed a Motion for Leave to Intervene in this Action as Defendants;

WHEREAS, Pond Operators deny that they have violated Section 9 of the ESA, 16 U.S.C. § 1538(a)(1)(B), and further deny that they have engaged in any activities that cause an unpermitted "take" of *rufa* red knots;

WHEREAS, on April 4, 2023, the Court granted Pond Operators' Motion for Leave to Intervene;

WHEREAS, on April 6, 2023, Plaintiffs, Charles River, and Pond Operators resolved the PI Motion cooperatively by consent order (the "Preliminary Consent Order"), which was entered as a Court order the same day;

WHEREAS, the Preliminary Consent Order, *inter alia*, stayed the scheduling order in this Action until a status conference at which the Court and parties would evaluate the effectiveness of the Preliminary Consent Order and explore final resolution of this Action;

WHEREAS, the Parties to the Action wish to fully resolve this Action cooperatively;

WHEREAS, Charles River and Pond Operators wish to continue obtaining horseshoe crabs in order to acquire Limulus amebocyte lysate to detect the presence of endotoxins in drug products and medical devices;

WHEREAS, Plaintiffs wish to conserve *rufa* red knots;

WHEREAS, the Parties to the Action have agreed to resolve the Action without any admission of any issue of fact, law, or liability;

THEREFORE, and with the consent of the Parties to this Action, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

2

## I.    JURISDICTION AND VENUE

1.    This Court has jurisdiction over the subject matter herein pursuant to the Endangered Species Act, 16 U.S.C. §§ 1538 and 1540, and 28 U.S.C. § 1331.  The Court also has personal jurisdiction over the Parties for the purpose of implementing this Consent Order and resolving the underlying Action.  Venue is proper under 28 U.S.C. § 1391(b).

2.    The Court shall retain continuing jurisdiction over this Action to consider all further applications arising out of or connected with this Consent Order.  The Parties shall not challenge the Court's jurisdiction to enforce the specific terms of this Consent Order.

## II.    APPLICABILITY

3.    The Court enjoins each of the Parties to this Consent Order and the Parties' respective agents, employees, independent contractors, and/or successors and assigns.

## III.    NOTICES

4.    Service.  Unless otherwise specified in this Consent Order or agreed in writing by the Parties, whenever notification, submissions, communications, or other similar written documents are required to be served by this Consent Order, they shall be made in writing by certified mail, return receipt requested, and addressed as follows:

Plaintiffs
Southern Environmental Law Center
Catherine M. Wannamaker
Carl T. Brzorad
525 East Bay Street
Suite 200
Charleston, SC 29403
cwannamaker@selcsc.org
cbrzorad@selcsc.org

Defendants
Charles River
Charles River Laboratories International, Inc.

3

Dan Toal
Lina Dagnew
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
dtoal@paulweiss.com
ldagnew@paulweiss.com

And

J. Ashley Twombley
Twenge + Twombley Law Firm
311 Carteret Street
Beaufort, SC 29902
twombley@twlawfirm.com

<u>Gault Seafood, LLC</u>
Patrick Wooten
Duffy & Young, LLC
96 Broad Street
Charleston, SC 29401
pwooten@duffyandyoung.com

<u>Marsh Point Farm, Inc.</u>
Patrick Wooten
Duffy & Young, LLC
96 Broad Street
Charleston, SC 29401
pwooten@duffyandyoung.com

<u>Robert H. Boyles, Jr., in his official capacity as Director of SCDNR</u>
Susan O. Porter
General Counsel
S.C. Department of Natural Resources
P.O. Box 167
Columbia, SC 29202
PorterS@dnr.sc.gov

5.      In the event that a Party or Parties obtain(s) new contact information for service, such Party or Parties will notify all other Parties in a writing specifying the new contact information, which will supersede the contact information set forth in paragraph 4 ("Service").

4

## IV.    BEACH CLOSURES

6.    For purposes of this Consent Order, "Beaches" shall mean all emergent land from the Mean Lower Low Water (MLLW) to the toe of the dunes or where the densely vegetated habitat begins.  This includes the shoreline and sandy intertidal zone that is covered at high tide and uncovered at low tide, as well as sand bars.

7.    <u>Closed Beaches</u>.  Except as otherwise specified in this Section, Charles River, Pond Operators, and each of their respective agents, employees and independent contractors are prohibited from collecting horseshoe crabs from March 15 through May 31 (the "Prohibited Dates") during each of the five consecutive Harvest Seasons (defined as March 15 through June 30) following entry of this Consent Order, through and including June 30, 2028 (the "Effective Period"), from any of the following Beaches (the "Closed Beaches") as defined in paragraph 6 ("Beaches"):

    a.    North Cape Island Beach(es)

    b.    South Cape and Lighthouse Island Beach(es)

    c.    Raccoon Key Complex and White Banks Beach(es)

    d.    Marsh Island Beach(es)

    e.    Bulls Island Beach(es)

    f.    Capers Island Beach(es)

    g.    Dewees Island Beach(es)

    h.    Isle of Palms Beach(es)

    i.    Sullivan's Island Beach(es)

    j.    Folly Beach Beach(es)

    k.    Bird Key-Stono

    l.    Kiawah and Seabrook Island Beach(es)

m.  Deveaux Bank Beach(es)

n.  Edisto Island Beach(es)

o.  Pine and Otter Island Beach(es)

p.  Harbor and Hunting Island Beach(es)

q.  Fripp Island Beach(es)

r.  Hilton Head Island Beach(es)

s.  Daufuskie Island Beach(es)

t.  Turtle Island Beach(es) [Note that "Turtle Inlet" is addressed in

paragraph 8 below]

u.  Jones Island Beach(es)

v.  Cape Romain National Wildlife Refuge ("Cape Romain")

w.  Bay Point Island and Bay Point Shoal Beach(es)

x.  Little Capers Island Beach(es)

y.  North Island Beach(es)

z.  Crab Bank Seabird Sanctuary

aa. Pritchards Island Beach(es)

bb. Tomkins Island Beach(es)

cc. Joiner Bank Beach(es)

8.    <u>Turtle Inlet</u>.  The Parties agree that the area to the right and/or northeast of

the red line depicted in the photograph attached as Exhibit A is a Closed Beach for purposes

of this Consent Order; and the area to the left and/or southwest of the same red line is not

a Closed Beach.

9.    Cape Romain.  The Pond Operators, Charles River, and/or their respective agents, employees and independent contractors will not collect horseshoe crabs in Cape Romain for the duration of the Effective Period.  This includes all land, waters, marsh, Beaches, or other areas within Cape Romain.[1]

10.    No Purchasing, Selling, Holding, Biomedically Processing Horseshoe Crabs Collected in Violation of Consent Order.  Charles River, Pond Operators, and their respective agents, employees and/or independent contractors will not purchase, sell, hold, or biomedically process any horseshoe crabs known to be collected in violation of the terms of this Consent Order.

## V.    SCDNR PERMITS

11.    No Female Crabs in Holding Ponds.  SCDNR shall, using language deemed appropriate by the Department, ensure that a prohibition on holding female horseshoe crabs in holding ponds during the Effective Period is reflected in the terms of the relevant horseshoe crab Permit Conditions, as defined below in paragraph 12 ("Permit Condition Amendments"), and shall not make this prohibition less stringent during the Effective Period (*i.e.*, by allowing the holding of female horseshoe crab(s) in ponds).

12.    Permit Condition Amendments.  SCDNR agrees to make the following amendments to the conditions set forth in the SCDNR-issued permits for the biomedical processing, harvest and transport, and/or possession of horseshoe crabs in South Carolina (respectively, and each together with any amended forms that may be adopted in the future, "Biomedical Permits," "Hand Harvest Permits," and "Pond Permits"; and collectively,

---

[1]    The Parties acknowledge that the Beach Closures and closure of Cape Romain to horseshoe crab collection during the Effective Period shall not be affected or modified by the final critical habitat designations for the red knot or the outcome of any litigation related to Cape Romain.

"Permits"; and holders of such Permits are "Permittees"; and the conditions set forth in such Permits are "Permit Conditions"), as specified below. These amendments will be effective starting with the 2024 Harvest Season and through the remainder of the Effective Period. In the event that a Permit Condition identified below is identified as a condition of one or two of the Biomedical Permit, Hand Harvest Permit, and Pond Permit but not all three, and the condition is subsequently incorporated into the remaining Permit(s) or such additional Permits as SCDNR might create, it is the amended version of the condition set forth below that will have effect.

| Permit(s) | Condition | Amended Condition |
|---|---|---|
| Biomedical ¶ 5 | "Horseshoe crabs must be bled/processed as soon as possible after receipt." | "Horseshoe crabs must be bled/processed as soon as **practicable** after receipt." |
| Biomedical ¶ 5, Hand Harvest ¶ 7, Pond ¶ 7 | "[C]rabs must be handled so as to minimize injury to the crab" | "[C]rabs must be handled so as to minimize injury to **and death of** the crab, **including avoiding walking and standing on crabs, handling crabs by the telson (tail), and dropping/tossing crabs.[2] Gently dropping/tossing crabs is permitted.** |
| Hand Harvest ¶ 1, Pond ¶ 1 | "All horseshoe crabs must be maintained alive." | "All horseshoe crabs must be maintained **so as to minimize injury to and death of the crab**" |
| Pond ¶ 2 | "All efforts should be made not to hold any horseshoe crab for longer than two weeks from time of harvest to biomedical processing." | "All **reasonable efforts** should be made not to hold any horseshoe crab for longer than two weeks from time of harvest to biomedical processing." |
| Pond ¶ 1 | "Male crabs harvested from holding pond(s) must be delivered to the | "Male crabs harvested from holding pond(s) must be delivered to the biomedical LAL bleeding |

---

[2]    The Parties agree that the limitation on dropping or tossing crabs does not apply to existing practices used by Pond Operators to place crabs in ponds or waters.

| Permit(s) | Condition | Amended Condition |
|---|---|---|
| | biomedical LAL bleeding facility within 12 hours." | facility within 12 hours of their removal from the pond(s)." |

13.     <u>Status Quo of Permit Conditions to Be Maintained</u>.  SCDNR will maintain the status quo on Permit Conditions for the Effective Period, with the 2023 Permit Conditions as the baseline.  This provision is not intended to require SCDNR to use the exact same Permit Conditions language during this period, nor is it intended to prevent SCDNR from making *de minimis* modifications to the Permits as needed to improve enforcement or clarify existing provisions.  If SCDNR needs to make substantive changes to the Permit Conditions during the Effective Period: (a) due to a change of state or federal law or regulation—provided that SCDNR shall not issue any regulations purporting to require changes to the Permit Conditions during the term of this Consent Order and may not request or encourage any other state or federal agency to issue any such regulation— or directive/best management practice from the Atlantic States Marine Fisheries Commission ("ASMFC") relating to the horseshoe crab fishery in South Carolina and/or (b) in the event of an unanticipated extraordinary emergency or catastrophe that affects horseshoe crabs or *rufa* red knots in South Carolina, SCDNR will confer with the Parties, and, if no reasonable agreement has been reached on a proposal, will petition the Court with its proposed revision(s) to the Permit Conditions and the basis for the request, including any research supporting the request.  The other Parties shall respond to any petition within the time period allowed by the Local Civil Rules of this Court.  SCDNR may file a reply memorandum to the extent permitted by the Local Civil Rules.

14.    <u>Notice of Permits</u>.  Upon finalization each Harvest Season during the Effective Period, SCDNR will provide blank copies of the Biomedical Permit, Hand Harvest Permit, and Pond Permit, including the Permit Conditions set forth in each Permit, simultaneously to Plaintiffs, Charles River, Pond Operators, and the Monitor.

**VI.    COVENANT NOT TO SUE; RELEASE**

15.    <u>Dismissal with Prejudice</u>.  Plaintiffs will move to dismiss the Action with prejudice within 10 days of entry of this Consent Order by the Court.  This Consent Order will not be effective and will not confer any rights or obligations on the Parties unless and until the Action is dismissed with prejudice.  This provision does not limit Plaintiffs' ability to (a) bring a new action once the Consent Order is terminated at the end of the Effective Period, provided it is not extended by the Parties, and/or (b) enforce the terms of the Consent Order.

16.    <u>Release and Covenant Not to Sue</u>.  Plaintiffs fully release through the Effective Period and, during the Effective Period, will not bring, cause to be brought, or assist in bringing any action against Defendants or Defendants' respective agents, employees, independent contractors, successors or assigns arising from or related to the collection, handling, transport, holding or otherwise possessing, biomedical processing, or release of horseshoe crabs, or other activities related to the use of horseshoe crabs for biomedical purposes, in South Carolina, or the permitting or authorization of the aforementioned activities ("Release and Covenant Not to Sue"); <u>provided</u> that this Release and Covenant Not to Sue shall not prohibit Plaintiffs from (1) bringing, causing to be brought, or assisting in bringing any action against Defendants or Defendants' respective agents, employees, independent contractors, successors or assigns arising from or related to the collection or biomedical processing of horseshoe crabs, or the authorization or

10

permitting of such activities, during the Effective Period *if* the total number of crabs collected in South Carolina for the purposes of biomedical processing by Charles River and/or its agents, employees, and/or independent contractors exceeds 300,000 crabs in a calendar year; or (2) intervening in any legal action related to Cape Romain during the Effective Period, so long as no claims in such legal action are brought against Charles River, Pond Operators, and/or their respective agents, employees, independent contractors, successors and/or assigns.

**VII.    MONITORING AND REPORTING**

17.    <u>Monitor</u>.

a.    Appointment and Duties.  Steve Nichols and W. Mac Baughman of Newkirk Environmental Inc., 1887 Clements Ferry Rd., Charleston, SC 29492 (the "Monitor") will be retained to monitor compliance with the Consent Order during the Effective Period and to carry out the duties set forth in this Consent Order, unless and until the Court appoints a different person or persons to perform the duties of the Monitor set forth in this Consent Order, after which time "Monitor" shall mean such person or persons. Any such appointment will be subject to the views of Plaintiffs, Charles River, and Pond Operators, who agree to work cooperatively in good faith to identify such person or persons and make a proposal to the Court.

b.    Compensation.  Each year during the Effective Period, measured from the start of one Harvest Season to the start of the subsequent Harvest Season, Charles River will compensate the Monitor in an amount of or less than $100,000.  The Monitor shall confer with the Parties prior to exceeding charges of $100,000, and may not charge more than $100,000 without the Parties' authorization and agreement as to payment

11

allocation for fees in excess of $100,000. In no event shall SCDNR be responsible for any payment to the Monitor.

        c. Communications. If an attorney for any Party initiates substantive communication concerning this Consent Order with the Monitor, that Party's attorney must invite attorneys for the other Parties to participate in the communication and, unless the circumstances call for more urgent action in the initiating Party's reasonable discretion, afford no more than 24 hours for the attorneys for the other Parties to respond before proceeding with the substantive communication. There will be no such requirement on the Parties or their attorneys either if the Monitor initiates communication concerning this Consent Order with any Party or Parties or the attorney(s) for any Party or Parties, or for any non-substantive, clerical, fee-related, and/or administrative communications.

        d. Site Visits. The Monitor may visit locations where Charles River, Pond Operators, and/or their agents, employees and/or independent contractors engage in collecting, transporting, holding, biomedically processing, and/or releasing horseshoe crabs ("Site Visits") at his reasonable discretion and upon reasonable notice. When reasonably practicable, the Monitor will notify Plaintiffs, Charles River, and Pond Operators at least two days in advance of any planned Site Visits and of any anticipated attendees. For the avoidance of doubt, Plaintiffs will not attend Site Visits, but any Party, with notice to the remaining Parties of at least 24 hours, may attend Site Visits of public lands or waters. At his discretion, and abiding by all applicable access restrictions, the Monitor may also visit or observe, through technology or otherwise, any of the Closed Beaches or Cape Romain to monitor compliance.

18.    GPS.

a. Charles River and Pond Operators will require their respective agents, employees and/or independent contractors involved in the collection of horseshoe crabs in South Carolina during the Harvest Season to utilize a GPS device while collecting crabs and provide Charles River and Pond Operators, as set forth in this paragraph, a record of all locations where the collecting was performed. The record of all locations where collecting was performed (i.e., the GPS record) will be provided to the Party acquiring horseshoe crabs from such agent, employee and/or independent contractor.

b. A copy of such GPS record must be provided weekly to Plaintiffs, SCDNR, and the Monitor by Defendants beginning within ten (10) days of the first collection of the Harvest Season.

c. Agents, employees and/or independent contractors of Pond Operators involved in the collection of horseshoe crabs in South Carolina during the Harvest Season will continue to use the same GPS units that were used during the 2023 Harvest Season. To the extent technologically practicable, Charles River will take reasonable steps to ensure that the GPS units be programmed to record locations approximately every five minutes from the time one leaves a boat landing for the purpose of collecting horseshoe crabs and to record when movement starts and stops.[3] In the event that, during the Effective Period, technological developments make compliance with this subparagraph impossible or impracticable, the Parties will confer in good faith to reach a reasonable resolution. In the event that, during the Effective Period, a GPS unit can no

---

[3]    The Parties acknowledge that when GPS units are so programmed and with the increased GPS reporting frequency provided under this Consent Order, a ping in areas including the areas listed as Closed Beaches will not necessarily represent collection of horseshoe crabs as users may be traveling or passing through the areas.

13

longer be effectively used because of damage, normal wear and tear, or other malfunction, the agent, employee, and/or independent contractor is required to get it repaired or replaced with any available model as soon as reasonably practicable. Charles River will obtain and hold a reasonable number of duplicate GPS units for this purpose.

19. <u>Reporting</u>. For purposes of this paragraph, "Reports" are the required reports that Permittees submit to SCDNR pursuant to the Permits. Each Harvest Season during the Effective Period, Charles River and Pond Operators will provide Plaintiffs with copies of their own respective Reports that they submit to SCDNR within seven (7) business days of submitting them to SCDNR.

a. Each Harvest Season during the Effective Period, Pond Operators will inform that their agents, employees and/or independent contractors who are Permittees involved in the collection of horseshoe crabs in South Carolina during the Harvest Season of a requirement to promptly provide Pond Operators with copies of Reports the Permittee submitted to SCDNR. Pond Operators will provide copies of any such Reports that they receive to Charles River and Plaintiffs, with Permittees' identifying information redacted,[4] within seven (7) business days of receipt by the Pond Operators. Pond Operators are not responsible for providing Plaintiffs with any Reports that Pond Operators did not timely receive from other Permittees and this is not a violation of this Consent Order by Pond Operators unless Pond Operators subsequently knowingly purchase more than a *de minimis* number of crabs from the Permittee who has not furnished the required Report(s), all subject to paragraph 25 ("Enforcement and Procedure"). A Hand Harvest Permittee who

---

[4]    Provided that the Pond Operators shall identify any Permittee to the Parties as necessary to investigate or resolve an alleged violation of this Consent Order.

has failed to submit to the Pond Operator(s) the required Report(s) may be deemed in violation of the Consent Order subject to paragraph 25 ("Enforcement and Procedure").[5]

  b.  The disclosures described in this section are subject to the terms of the Confidentiality Order in this Action docketed at ECF No. 57 and attached hereto as Exhibit B (the "Confidentiality Order"). Plaintiffs agree that Reports and other documents, data, or information provided pursuant to this paragraph must be kept completely confidential and in accordance with the Confidentiality Order, and will not be used against Defendants in connection with this Action or any other legal action.

  c.  Before providing monthly harvesting reports received from Hand Harvest Permittees to Plaintiffs, Pond Operators will assign a unique, anonymous harvester number (e.g., from 1 to 10) for each harvester and list it on each Report, and the same number shall be used to identify each harvester with their GPS data reports. This provision is intended to enable the Parties to cross reference the Report to SCDNR from the Hand Harvest Permittee against his/her GPS data for a given collection.

  d.  At the end of each Harvest Season, Charles River and Pond Operators will provide Plaintiffs with good-faith calculations of season totals for the numbers of horseshoe crabs collected, delivered to ponds, and received for biomedical processing, together with mortalities, male/female breakdowns, and the dates of first and last delivery. Plaintiffs agree that these data must be kept completely confidential and can only be used against Defendants to enforce the Consent Order and in accordance with the

---

[5]   In the event that Charles River, in order to obtain horseshoe crabs in South Carolina, contracts with a Hand Harvest Permittee who is not an agent, employee, and/or independent contractor of the Pond Operators covered by this Paragraph, Charles River shall assume the obligations of the Pond Operators described in this Paragraph and Paragraph 19(c), infra, solely with respect to that Hand Harvest Permittee.

Confidentiality Order.  Plaintiffs agree that Charles River and Pond Operators will tally the data described in this subparagraph in good faith using reasonable efforts but, given various difficulties, cannot and will not attempt to present precise numbers.[6]

     e.  If, during the Effective Period, SCDNR provides Plaintiffs with any Reports and/or other documents, data, or other information related to the subject matter of this Action absent a FOIA request, SCDNR will simultaneously provide copies of the same Reports, documents, data, or other information to Charles River and Pond Operators.

## VIII.  TRAINING

20.    Before the start of each Harvest Season during the Effective Period, SCDNR will offer reasonably accessible training to Permittees.  Failure to attend these trainings is neither a violation of this Consent Order nor a basis for invoking the dispute resolution procedure set forth in paragraph 25 ("Enforcement and Procedure").

## IX.  FUNDS

21.    <u>Fees</u>.  Charles River will pay Plaintiffs' attorneys' fees in the amount of $650,000.  Such payment will fully satisfy any obligation Defendants may have to pay Plaintiffs' attorneys' fees and costs in this Action.  Plaintiffs will not seek a fee award as against SCDNR in connection with this Action.  A prevailing Party in either a frivolous claim of a violation of the Consent Order or on a motion to enforce the Consent Order for substantial violations of the Consent Order may submit to the Court an application for reasonable fees for the motion.

---

[6]    Charles River and Pond Operators reserve all rights to contest the substantive accuracy of SCDNR's First Supplemental Answers to Plaintiffs' First Set of Interrogatories, dated November 4, 2022.

X.    **NOTICE TO AGENTS, EMPLOYEES, AND/OR INDEPENDENT CONTRACTORS OF CHARLES RIVER AND POND OPERATORS**

22.    <u>Notice and Certification</u>.  Charles River and Pond Operators will provide an annual written notice of the terms of this Consent Order and the applicable SCDNR Permit Conditions to their respective Permittee agents, employees and/or independent contractors.  At the conclusion of each Harvest Season, Charles River and Pond Operators will require their respective agents, employees and/or independent contractors involved in the collection of horseshoe crabs during the Harvest Season in South Carolina to certify that, on the Prohibited Dates, any horseshoe crabs collected for biomedical processing by Charles River and/or its agents, employees, and/or independent contractors were not collected from any of the Closed Beaches or Cape Romain, as set forth in paragraphs 7 and 9 ("Closed Beaches" and "Cape Romain," respectively).

XI.    **ENFORCEMENT, VICARIOUS LIABILITY, AND DISPUTE RESOLUTION**

23.    <u>Exclusivity</u>.  Unless otherwise expressly provided for in this Consent Order, the Parties will use the dispute resolution procedures in this Section to resolve disputes arising under or with respect to this Consent Order.  The provisions in this Section do not apply to SCDNR's actions in enforcing its permits.

24.    <u>Notification of Violations</u>.  Charles River, Pond Operators, and Plaintiffs agree to advise all other Parties and the Monitor in writing of any violations of this Consent Order of which they are aware.  Charles River and Pond Operators further agree to provide written notice to their respective agents, employees, and/or independent contractors involved in the collection, transport, and biomedical processing of horseshoe crabs in South Carolina that they must report any violations of which they are aware to all Parties and the Monitor.

25.   Enforcement and Procedure

a.   If any Party believes that there has been a violation of this Consent Order ("Concerned Party"), they shall, after giving the Notification of Violations described in paragraph 24, confer with the alleged violator in a good faith attempt to cooperatively resolve the alleged violation and/or redress any harm caused by the alleged violation. If, after allowing a reasonable time for conferral and/or implementation of any mutually agreed-upon measures to resolve and/or redress the issue, the alleged violation has not been adequately resolved and/or redressed, the Concerned Party may declare an impasse and file with the Court a motion to enforce the Consent Order. A motion to enforce the Consent Order may only be filed under the following circumstances.

- If the alleged violator is Charles River, the Pond Operator(s), and/or their employees, agents, independent contractors, or assigns, the Concerned Party may only file a motion to enforce: (1) against Pond Operators, the prohibition on holding female horseshoe crabs in holding ponds; against Hand Harvest Permittees, the prohibition on collecting horseshoe crabs from Closed Beaches or Cape Romain; and/or against applicable Permittees, the reporting obligations of the Permittees under this Consent Order described at paragraph 18 ("GPS") and paragraph 19 ("Reporting"), and the Notice and Certification obligations of Charles River and the Pond Operators to other Permittees described at paragraph 22 ("Notice and Certification"), provided that for any of these violation(s), the violation(s) is/are more than *de minimis*, and/or (2) against applicable Parties, recurring and unresolved violations of the

18

Permit Conditions.  Any other violations of the Permits or Consent Order by the Permittees, including *de minimis* violations of this Consent Order and non-recurring and/or promptly corrected violations of the Harvest and/or Holding Pond Permit, are not enforceable under this Consent Order.  Nothing in this Consent Order shall impair SCDNR's full discretion to enforce the terms of its Permits.

- If the alleged violator is SCDNR, the Concerned Party may only file a motion to enforce the specific provisions of the Consent Order that impose obligations on SCDNR.  *See* Section V ("SCDNR Permits"), paragraph 19(e) ("Reporting"), Section VIII ("Training"), paragraph 29 ("Document Destruction/Return").  For the avoidance of doubt, SCDNR retains full discretion to enforce the terms of its Permits throughout the Effective Period, and SCDNR's enforcement decisions shall not be the subject of any motion to enforce this Consent Order.

b.  The other Parties shall respond to the moving Party's motion within the time period allowed by the Local Civil Rules of this Court.  The moving Party may file a reply memorandum to the extent permitted by the Local Civil Rules.  The Court may reach a determination it deems appropriate.

26.    The invocation of dispute resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation under this Consent Order, unless and until final resolution of the dispute so provides or upon other order of the Court.

27.    <u>No Vicarious Liability</u>.  Charles River and Pond Operators will not be held vicariously liable for violations of the Consent Order by their respective agents, employees, and/or independent contractors if the violations were committed without their knowledge.

## XII.    DOCUMENT RETENTION, RETURN, AND DELETION

28.    <u>Document Retention</u>.  Upon entry of this Consent Order and dismissal with prejudice of the claims in this Action, Plaintiffs, Charles River, and Pond Operators will be permitted to retain SCDNR's First Supplemental Answers to Plaintiffs' First Set of Interrogatories, dated November 4, 2022; documents received during the 2023 Harvest Season that are related to the 2023 Harvest Season; and any of their respective attorney work product related to this Action.  The retention of the foregoing documents is strictly subject to the terms of the Confidentiality Order.  At the conclusion of the Effective Period, SCDNR's First Supplemental Answers to Plaintiffs' First Set of Interrogatories, documents received during the 2023 Harvest Season, and documents received in the process of implementing this Consent Order through the end of the Effective Period will be returned or destroyed consistent with the Confidentiality Order.

29.    <u>Document Destruction/Return</u>.    Pursuant to Section 10(b) of the Confidentiality Order, and subject to paragraph 28 ("Document Retention"), the Parties stipulate to the deletion of electronic documents in their possession designated "Confidential" by another Party in lieu of return to the producing Party, except that confidential documents possessed only in physical/paper form may be returned to the producing Party or destroyed.  Counsel for the Parties need not search for and delete emails with counsel for another Party containing confidential information.  Documents described in paragraph 28 ("Document Retention") need not be deleted but must be kept confidential in accordance with the Confidentiality Order.

## XIII.   EXTENSION OF THE AGREEMENT

30.     Prior to the expiration of the Effective Period of this Consent Order, the Parties shall confer and may extend the Effective Period for an amount of time agreeable to all Parties.

## XIV.   JOINT STATEMENT

31.     Upon entry of this Consent Order and dismissal with prejudice of Plaintiffs' claims in this Action, the Parties will issue the joint statement attached hereto as Exhibit C. This will be the only press release from each of the Parties and their attorneys and/or representatives on the entry into the Consent Order except as required by law. Any further external communications on the Consent Order from each of the Parties and their attorneys and/or representatives shall be consistent with the tone and spirit expressed in the joint press release and shall not disparage any other Party, including the Party's attorney(s) and/or representatives. This provision shall not restrict Plaintiffs from commenting on violations of the Consent Order that are brought before the Court.

## XV.   ENTIRE AGREEMENT

32.     The Parties hereby acknowledge that this Consent Order sets forth all of the terms of their settlement of this Action and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein. No other document, nor any representation, inducement, agreement, understanding or promise constitutes any part of this Consent Order or the settlement it represents, nor shall it be used in construing the terms of this Consent Order.

## XVI.  SIGNATURES

33.     This Consent Order may be signed in counterparts, and its validity will not be challenged on that basis.

21

## XVII.  EXHIBITS

34.     The following Exhibits are attached to and incorporated as part of this

Consent Order:

        a.   Exhibit A is the photograph of Turtle Inlet referenced in paragraph

            8 above ("Turtle Inlet")

        b.   Exhibit B is the Confidentiality Order in this Action docketed at

ECF No. 57.

        c.   Exhibit C is the Joint Statement referenced in Section XIII ("Joint

Statement") above.

35.     All terms in the Exhibits shall be construed in a manner consistent with

this Consent Order.

**AND IT IS SO ORDERED.**


Dated and entered this **23ʳᵈ** day of ___August___, 2023.
                            Charleston, South Carolina

_____
Hon. Richard Mark Gergel
United States District Court Judge
District of South Carolina

We Consent:

_____
Counsel, Defenders of Wildlife and
South Carolina Coastal Conservation League


_____
Counsel, Charles River Laboratories
International, Inc.

_____
Counsel, Gault Seafood, LLC and Marsh
Point Farm, Inc.

_____
Counsel, Robert H. Boyles, Jr. in his official
capacity as Director of the South Carolina
Department of Natural Resources